887 So.2d 929 (2001)
Torrey Twane McNABB
v.
STATE of Alabama.
CR-98-0967.
Court of Criminal Appeals of Alabama.
October 26, 2001.
Opinion on Return to Remand February 1, 2002.
Opinion Overruling Rehearing April 25, 2003.
*939 Morris Dees, Montgomery; and Thomas M. Goggans, Montgomery, for appellant.
William H. Pryor, Jr., atty. gen., and Michelle Riley Stephens and Kristi L. Deason Hagood, asst. attys. gen., for appellee.
SHAW, Judge.[1]
The appellant, Torrey Twane McNabb, was convicted of two counts of capital murder in connection with the murder of Montgomery Police Officer Anderson Gordon. The murder was made capital because Officer Gordon was on duty at the time of his death, see § 13A-5-40(a)(5), Ala.Code 1975, and because Officer Gordon was in his patrol car at the time of his death, see § 13A-5-40(a)(17), Ala.Code 1975. McNabb was also convicted of two counts of attempted murder. The jury, by a vote of 10-2, recommended that McNabb be sentenced to death for his capital-murder convictions. The trial court accepted the jury's recommendation and sentenced McNabb to death. The trial court also sentenced McNabb to 20 years' imprisonment for each count of attempted murder.
On September 24, 1997, at approximately 1:30 p.m., Officer Anderson Gordon's body was found slumped behind the steering *940 wheel of his patrol car, with his foot still on the brake pedal, at the intersection of Rosa Parks and National Avenue in Montgomery. Officer Gordon had been shot five times. His death was the result of a shot that entered his chest and severed his aorta.
Sanford Sharpe, a bail bondsman, testified that he was hired by All States Bonding Company to locate McNabb after McNabb had failed to appear for two court appearances relating to charges of receiving stolen property and possessing a controlled substance. McNabb's grandmother had secured his bond with All States Bonding Company and, after McNabb had failed to appear in court, a capias warrant was issued for his arrest. Sharpe testified that he located McNabb sometime in August 1997 at his grandmother's residence. Sharpe testified that he spoke with McNabb for several minutes and that McNabb told him he would go with him as soon as he put on some shoes. However, McNabb fled out the back door of the house.
On September 24, 1997, at approximately 1:30 p.m., Sharpe said, he again located McNabb; this time McNabb was sitting in an automobile parked on the street outside his grandmother's residence. Sharpe testified that he attempted to pull his truck in front of McNabb's vehicle to block McNabb, but that when McNabb looked up and saw him, McNabb pulled around his truck and sped away. Sharpe stated that he pursued McNabb and that when McNabb reached the intersection of Rosa Parks and National Avenue, McNabb sped through a stop sign and struck another vehicle. Sharpe drove up to the scene of the accident and, just as he was about to put his truck in park, McNabb got out of his vehicle, pulled a gun, and began shooting at him. Sharpe stated that he immediately pressed the gas pedal and sped down the street to get away from the gunfire. Sharpe drove around the block and telephoned emergency 911 on his cellular telephone. He then returned to the scene of the accident. Sharpe said that when he got back to the scene, he parked his truck next to a Montgomery police patrol car that was parked on the side of the road. When he approached the patrol car, Sharpe said, he saw that the officer in the car, Officer Gordon, had been shot several times. Fearing that McNabb was still nearby, Sharpe pulled out his gun, a 9mm Lorcin pistol, which he kept on his person. At that point, several other Montgomery police officers converged on the scene and confiscated Sharpe's pistol.
Annie Gamble testified that in the early afternoon of September 24, 1997, she was driving on Rosa Parks Avenue after she had dropped her husband off at work when a white vehicle ran a stop sign at the corner of Rosa Parks and National Avenue and struck her car. Gamble said that after the accident, a man, whom she identified as McNabb, got out of the white vehicle and waved a gun in her direction. She pleaded with him not to shoot. Gamble said that a red truck then drove by and McNabb began shooting at it as it continued down National Avenue. After the truck was out of sight, Gamble said, McNabb turned and saw a Montgomery police patrol car parked on the corner. Gamble testified that McNabb walked to the patrol car with his gun by his side, hidden from view. Gamble testified that as McNabb was approaching the car, "some words were passed" between McNabb and the officer. (R. 1871.) When he reached the rear of the patrol car, Gamble said, McNabb began firing into the car, shooting out the rear window in the process. Gamble stated that when the officer attempted to return fire, McNabb fled, running behind a nearby church. After McNabb fled, Gamble approached *941 the patrol car to check on the officer. Shortly thereafter, Gamble said, several Montgomery police officers arrived at the scene.
Christopher Best testified that he was walking toward the Beulah Baptist church on the corner of Rosa Parks and National Avenue when he saw a white vehicle run a stop sign at the intersection and collide with another vehicle. Best testified that the driver of the white vehicle got out his car and began firing a gun at a red truck that was driving down National Avenue. Best said that as soon as he heard the first shot, he ran behind the church for cover. The driver of the white vehicle then walked in front of the church, out of Best's line of vision. However, Best said, as soon as he lost sight of him, he heard several gunshots in rapid succession. Best testified that the driver of the other vehicle in the accident, Gamble, screamed and then ran in front of the church from which Best had heard the shots coming. Best said that he then went to the front of the church and saw Gamble leaning in the window of a police car and screaming for someone to call emergency 911. Best went back to the church and asked someone to telephone 911 because an officer had been shot. He then went to the police car, where a crowd had developed. Best said that he immediately noticed that both the front and back windows on the driver's side had been shot out. At that point, Best said, the driver of the truck that had been shot at returned to the scene. When the driver got out of the truck, Best said, he had a telephone in his hand. He also reached back into his truck, got a gun, and put it in his waistband. At that point, Best said, several Montgomery police officers arrived at the scene.
Michael Johnson testified that he lives at the intersection of Rosa Parks and National Avenue in Montgomery, across the street from the Beulah Baptist church, and that on September 24, 1997, at approximately 1:30 p.m., he heard what he thought were firecrackers and he looked out his front window. Johnson testified that he saw a Montgomery police patrol car stop in front of the church. He then saw a young black male, wearing dark-colored shorts and no shirt, approach the patrol car, holding a gun behind his back. Johnson said that the officer in the patrol car rolled his window part way down and spoke with the man briefly. The man then opened fire on the officer "out of the blue." (R. 1915.) Johnson testified that the officer did not have his weapon out when the man first fired at him. Johnson said that after the officer was shot, he telephoned emergency 911 and then went outside to the patrol car. According to Johnson, both driver's side windows in the patrol car, front and back, were shot out, and glass was all over the ground.
Jeffrey Dyson, a cable contractor, testified that on September 24, 1997, he was working near the corner of Rosa Parks and National Avenue. At approximately 1:30 p.m. that afternoon, Dyson said, he walked to the front of the Beulah Baptist church and saw two wrecked cars in the intersection. Dyson testified that a man was standing near the cars in the intersection; the man had no shirt on and was wearing dark green shorts. At that point, Dyson said, the man walked toward a Montgomery police patrol car that had just pulled up to the accident. Dyson said the man had his hands behind his back as he was walking toward the patrol car. At that point, Dyson said, he turned away and went back to work. A few seconds later, however, he heard gunshots. When he turned around again, Dyson said, he saw the man shooting at the officer in the patrol car. Dyson testified that the man then ran from the patrol car. According to Dyson, the man ran behind the church, *942 climbed a six-foot chain-link fence, and then continued running away from the scene. Dyson testified that the man did not appear to be injured and that he climbed over the fence "real quick." (R. 1933.)
John Reynolds testified that on September 24, 1997, he was working behind the Beulah Baptist church when he heard what sounded like a collision at the intersection of Rosa Parks and National Avenue. When he looked around the church toward the intersection, Reynolds said, he heard gunshots and immediately went back behind the church for cover. Reynolds said that he then heard more gunshots and saw a man wearing green shorts and no shirt run behind the church and "scale the fence" that was behind the church. (R.1943.) Reynolds testified that he saw the man drop a gun on the ground and then lean down and pick it up just before he climbed the fence. Once over the fence, Reynolds said, the man ran toward a ditch that was behind the church.
Shortly after the shooting, several Montgomery police officers arrived at the scene in response to the numerous 911 calls and began looking for McNabb. Officer William M. Perkins testified that he was in his patrol car when the dispatcher informed him that an officer had been shot and that the shooter had run toward a ditch behind the Beulah Baptist Church. Officer Perkins immediately went to the scene, where he met Officer Danny Jackson. As he and Officer Jackson surveyed the ditch, Officer Perkins said, he saw a man standing in a nearby yard. The man pointed to a particular part of the ditch. Officer Perkins testified that he then looked toward the portion of the ditch the man had been pointing at and then looked away so as not to alert the suspect. At that point, Officer Perkins said, the suspect, who Officer Perkins identified as McNabb, stood up in the ditch and fired at him one time. Officer Jackson returned fire, wounding McNabb. Officer Perkins then went into the ditch and retrieved McNabb's 9mm Luger pistol  which, Officer Perkins said, was empty  and arrested McNabb. McNabb was then taken to a nearby hospital.
At trial, McNabb admitted that he shot and killed Officer Gordon and that he had fired at Sharpe and Officer Perkins. McNabb stipulated that the 9mm pistol taken from his person at the scene of the crimes was the pistol that was used to kill Officer Gordon and to shoot at Sanford Sharpe and Officer Perkins; that two projectiles found on the hospital gurney under Officer Gordon's body came from his pistol; that one projectile found during the autopsy of Officer Gordon came from his pistol; that projectile fragments found imbedded in the passenger door of Sanford Sharpe's truck came from his pistol; and that a projectile found imbedded in Officer Perkins's patrol car came from his pistol.
McNabb asserted two somewhat conflicting defenses at trial. First, as to the charge of attempting to murder Sanford Sharpe, McNabb asserted that he was acting in self-defense. He maintained that Sharpe had pulled a gun on him, that he fled, and that he shot at Sharpe's truck only to protect himself from an "out of control bounty hunter." (R. 2427.) Second, as to both capital- murder charges and both attempted-murder charges, McNabb asserted that he did not have the intent to kill when he shot Officer Gordon and shot at Officer Perkins and Sanford Sharpe. He argued that he had ingested so much cocaine on the morning of the shootings that he was in a cocaine-induced state of paranoia that left him unaware of his actions.
In support of his cocaine-paranoia defense, McNabb called John Holbrook, a professor of pharmacology at Mercer University, *943 to testify on his behalf. Dr. Holbrook testified about the effects of cocaine on the central nervous system. Dr. Holbrook stated that cocaine is a stimulant, such as caffeine, that causes alertness and, often, a feeling of euphoria. As someone begins to use cocaine on a regular basis, Dr. Holbrook said, they may experience abnormal behaviors. According to Dr. Holbrook, habitual use of cocaine may lead to episodes of paranoia, which Dr. Holbrook described as "a fear that has no actual basis," similar to paranoid schizophrenia. (R. 2312.)
McNabb also testified on his own behalf at trial. He stated that he was a cocaine addict and that he had started using illegal narcotics when he was 14 or 15 years old (he was 20 years old at the time of the crimes). However, McNabb testified that his addiction to cocaine did not affect his ability to work and that when he used cocaine it "affect[ed] nothing." (R. 2246.) McNabb also testified that his mother was a cocaine addict and that his father "spent some time in prison." (R. 2189.)
McNabb stated that the night before the crimes, on September 23, 1997, he went to a club, drank beer, and snorted cocaine. He then went to his father's house to spend the night. When he could not fall asleep, McNabb said, he got up and snorted more cocaine until all of the cocaine in his possession, approximately one gram, was gone. After he finished the cocaine, at approximately 10:00 a.m. on September 24, 1997, McNabb went to his grandmother's house to see his sister. McNabb testified that his sister was not home, so he was waiting for her in his car. While he was waiting, McNabb said, he looked out his passenger-side window and saw a red truck next to his car. McNabb said that the driver of the truck was pointing a gun at him. McNabb then sped away. According to McNabb, he was trying to get away from the truck when he ran a stop sign at the corner of Rosa Parks and National Avenue and struck another vehicle. He then grabbed his gun and began firing at the red truck. At that point, McNabb said, he saw a Montgomery police patrol car pull up to the scene of the accident. McNabb stated that he walked over to the patrol car immediately "to get help" because, he said, he was scared. (R. 2211.) McNabb testified that as he approached the patrol car, he began telling the officer that a man was chasing him with a gun. At that point, McNabb said, the police officer rolled down the window in the car and pointed a gun at him. According to McNabb, when he saw the gun he "panicked" and "just shot." (R. 2212.) McNabb said that he thought the officer was going to kill him.
McNabb stated that the officer returned fire and shot him twice. McNabb then ran behind a nearby church and into a ditch. McNabb said that when he reached the ditch, he heard police sirens, and he began crawling toward the end of the ditch, trying to hide from the officers. When he reached the end of the ditch, McNabb said, he stood up and was shot. McNabb testified that he fired his gun only after he had been shot and that he was not shooting directly at the officers, that he "wasn't shooting at nothing." (R. 2272.)
McNabb further testified that, at the time of the crimes, he had never before seen Sanford Sharpe, nor did he know who Sharpe was. He maintained, in contradiction with Sharpe's testimony, that Sharpe had never spoken with him at his grandmother's house prior to the crimes. McNabb also stated that, at the time of the crimes, he did not know that he had missed any court appearances for his charges of receiving stolen property and possession of a controlled substance because, he said, no one had notified him of *944 any court appearances relating to those charges. Finally, McNabb testified that he did not know Officer Gordon.
On appeal, McNabb raises 12 issues, most of which he did not raise by objection in the trial court. Because McNabb was sentenced to death, his failure to object at trial does not bar our review of these issues; however, it does weigh against any claim of prejudice he now makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
Rule 45A, Ala.R.App.P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
"Plain error" has been defined as error "`so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.'" Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983), quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981). "To rise to the level of plain error, the claimed error must not only seriously affect a defendant's `substantial rights,' but it must also have an unfair prejudicial impact on the jury's deliberations." Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001). This Court has recognized that "`the plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Burton v. State, 651 So.2d 641, 645 (Ala.Crim.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting, in turn, United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

I.
McNabb contends that the trial court erred in refusing to grant his challenges for cause as to several prospective jurors who, he argues, indicated during voir dire that they would automatically vote to impose the death penalty if McNabb was convicted of capital murder. (Issue I in McNabb's brief.)
"`"The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is `whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."' Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Gray v. Mississippi, 481 U.S. 648 [at 657-58], 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). `The crucial inquiry is whether the veniremen could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment.' Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror's bias need not be proved with `unmistakable clarity' because `juror *945 bias cannot be reduced to question and answer sessions which obtain results in the manner of a catechism.' Id.

"`"A trial judge's finding on whether or not a particular juror is biased `is based upon determination of demeanor and credibility that are peculiarly within a trial judge's province.' Witt, 469 U.S. at 428, 105 S.Ct. at 854. That finding must be accorded proper deference on appeal. Id. `A trial court's ruling on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion.' Nobis v. State, 401 So.2d 191, 198 (Ala.Crim.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala.1981)."
"`Martin v. State, 548 So.2d 488, 490-91 (Ala.Crim.App.1988), affirmed, 548 So.2d 496 (Ala.1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). "[A] blanket declaration of support of or opposition to the death penalty is not necessary for a trial judge to disqualify a juror." Ex parte Whisenhant, 555 So.2d 235, 241 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990).'"
Dallas v. State, 711 So.2d 1101, 1107 (Ala.Crim.App.1997), aff'd, 711 So.2d 1114 (Ala.), cert. denied, 525 U.S. 860, 119 S.Ct. 145, 142 L.Ed.2d 118 (1998), quoting Taylor v. State, 666 So.2d 36, 47 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).
"[A] veniremember's personal feelings as to the law are immaterial unless those feelings are so unyielding as to preclude the veniremember from following the law as given in the court's instructions. `A veniremember who believes that the death penalty should automatically be imposed in every capital case should be excused.' Martin v. State, 548 So.2d 488, 491 (Ala.Crim.App.1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). However, veniremembers who favor the death penalty should not be excused for cause where they indicate they can follow the court's instructions. Id."
Smith v. State, 698 So.2d 189, 198 (Ala.Crim.App.1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997) (emphasis added). "Jurors who give responses that would support a challenge for cause may be rehabilitated by subsequent questioning by the prosecutor or the court." Johnson v. State, 820 So.2d 842 (Ala.Crim.App.2000), aff'd, 820 So.2d 883 (Ala.2001).
"Even though a prospective juror may initially admit to a potential for bias, the trial court's denial of a motion to strike that person for cause will not be considered error by an appellate court if, upon further questioning, it is ultimately determined that the person can set aside his or her opinions and try the case fairly and impartially, based on the evidence and the law. Knop v. McCain, 561 So.2d 229 (Ala.1989); Siebert v. State, 562 So.2d 586 (Ala.Crim.App.1989), affirmed, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990); Perryman v. State, 558 So.2d 972 (Ala.Crim.App.1989). Only when a prospective juror's testimony indicates a bias or prejudice so fixed or deep-seated that that person cannot be impartial and objective must a challenge for cause be granted by the trial court. Knop, supra; Siebert, supra; Perryman, supra."
Ex parte Land, 678 So.2d 224, 240 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996). "`"[A] preference *946 [toward imposing the death penalty], where the potential [juror] indicates that he or she could nonetheless consider life imprisonment without parole is not improper and it does not indicate that the juror is biased."'" Hagood v. State, 777 So.2d 162, 175 (Ala.Crim.App.1998), aff'd in pertinent part, rev'd on other grounds, 777 So.2d 214 (Ala.1999), on remand to, 777 So.2d 221 (Ala.Crim.App.2000), opinion after remand, 777 So.2d at 223 (Ala.Crim.App.2000), quoting Price v. State, 725 So.2d 1003, 1024 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063, (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999), quoting, in turn, Smith v. State, 698 So.2d 189 (Ala.Crim.App.1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997).
Initially, we note that the voir dire in this case was extensive  it encompasses approximately 8 volumes of the 18-volume certified record filed with this Court. Prospective jurors were questioned individually regarding their views towards capital punishment. It is clear from the record that many of the prospective jurors were confused about the process in a capital trial and that they were attempting to answer questions in such a way as to please whichever party's attorney was asking the questions. The record of the individual voir dire is replete with leading, ambiguous, confusing, and repetitive questions, in large part posed by defense counsel. In fact, when denying one of McNabb's challenges for cause, the trial court made the following comment on the nature of the voir dire examination and the resulting confusion:
"It is the duty of each side to search out any bias or any preconceived ideas that these jurors may have as relates to capital punishment or life in the penitentiary without parole. I am not going to cut anybody off on that. But it is my duty to advise the jury of the law and give them the instructions, etc. No trick questions that [sic] should be allowed in this process. So basically, I am listening to what the jurors are saying and in a broad view as opposed to a narrow view. I don't want to continue with repetitive questions over and over, where it's not getting any additional information or any different answer."
(R. 1440.) In Thomas v. State, 539 So.2d 375 (Ala.Crim.App.1988), this Court stated the following when faced with similar circumstances:
"At the beginning of [a juror's] voir dire examination, she stated she could set aside her personal opinions and would render a verdict based upon the evidence in the case and the court's instructions. However, upon further examination by defense counsel, [the juror] indicated that she had a fixed opinion as to the appellant's guilt and the defendant would have to prove the appellant innocent. While this is a very close question, we are unable to hold, as a matter of law, that the trial judge erroneously denied the challenge for cause as to [this juror].
"`The decision of a trial court to disqualify a venireman based on a challenge grounded on bias is entitled to great weight and will not be disturbed on appeal unless clearly shown to be an erroneous abuse of discretion.' Watwood v. State, 389 So.2d 549 (Ala.Crim.App.), cert. denied, 389 So.2d 552 (Ala.1980). See also, Glenn v. State, 395 So.2d 102 (Ala.Crim.App.1980), cert. denied, 395 So.2d 110 (Ala.1981).
"In Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), the U.S. Supreme Court addressed the question of whether to apply the statutory presumption of correctness [28 U.S.C. *947 § 2254(d)] to a state trial court's decision concerning a denial of the defendant's challenge for cause. In deciding that the statutory presumption of correctness should be applied to a trial court's resolution concerning challenges for cause, the Supreme Court gave two reasons.
"`First, the determination has been made only after an often extended voir dire proceeding designed specifically to identify biased veniremen. It is fair to assume that the method we have relied on since the beginning, e.g., United States v. Burr, 25 F.Cas. No. 14,692g, pp. 49, 51 (No. 14,692g) (CC Va.1807) (Marshall, C.J.), usually identifies bias. Second, the determination is essentially one of credibility, and therefore largely one of demeanor. As we have said on numerous occasions, the trial court's resolution of such questions is entitled, even on direct appeal, to "special deference." E.g., Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 500, 104 S.Ct. 1949, 1959, 80 L.Ed.2d 502 (1984).'
"Patton, 104 S.Ct. at 2892 (footnote omitted).
"The reasons set out above are also the reasons this court gives great weight to a trial court's decision on challenges for cause.
"In addressing whether there was fair support in the record for the trial court's denial of the challenges for cause in Patton, the Supreme Court stated:
"`The testimony of each of the three challenged jurors is ambiguous and at times contradictory. This is not unusual on voir dire examination, particularly in a highly publicized criminal case. It is well to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination tactics that frequently are employed, and that were evident in this case. Prospective jurors represent a cross section of the community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially. The trial judge properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading.'
"Patton, 104 S.Ct. at 2893.
"The U.S. Supreme Court's discussion, concerning two of the challenges for cause in Patton, is particularly relevant to the challenge for cause as to [this] juror....
"`Similarly, in the case of alternate juror Pyott, we cannot fault the trial judge for crediting her earlier testimony, in which she said that she could put her opinion aside "[i]f [she] had to," rather than the later testimony in which defense counsel persuaded her that logically she would need evidence to discard any opinion she might have. Id., at 246a, 250a-252a. Alternate juror Chincharick's testimony is the most ambiguous, as he appears simply to have answered "yes" to almost any question put to him. It is here that the federal court's deference must operate, for while the cold record arouses some concern, only the trial judge could tell which of these answers was said with the greatest comprehension and certainty.'

*948 "Patton, 104 S.Ct. at 2893.
"....
"`Qualification of a juror is a matter within the discretion of the trial court and, on appeal, this court will look to the questions propounded and to the answer given by the prospective juror to see if this discretion was properly exercised. Alabama Power Co. v. Henderson, Ala., 342 So.2d 323, 327 [(1976)].'
"Collins v. State, 385 So.2d 993, 1000 (Ala.Crim.App.1979), rev'd on other grounds, Ex parte Collins, 385 So.2d 1005 (Ala.1980), on remand, 385 So.2d 1010 (Ala.Crim.App.1980).
"`"The sufficiency of the cause of challenge is determined by the trial court, and the inquiries are addressed to the conscience of the juror under oath. He is examined touching his qualifications, in the presence of the judge, who sees his manner of answering the questions, and probing of his conscience, which is often times more clearly indicative of his disinterestedness, or bias than the mere words used. The reviewing court, therefore, should exercise caution, and the finding of the trial court should not be set aside, unless it affirmatively appears that, on the answers of the juror, taken as a whole, he entertained a fixed opinion which would bias his verdict." (Emphasis added.)'
"Nobis [v. State], 401 So.2d [191,] 197 [(Ala.Crim.App.), cert. denied, 401 So.2d 204 (Ala.1981),] (quoting Peterson [v. State, 227 Ala. 361] 150 So. [156,] 159 [(1933), cert. denied, 291 U.S. 661, 54 S.Ct. 439, 78 L.Ed. 1053 (1934)])."
539 So.2d at 388-90. (Footnote omitted.) We review each of McNabb's claims in turn.

A.
McNabb contends that the trial court erred in refusing to grant his challenge for cause as to prospective juror J.B. During individual voir dire examination of J.B., the following occurred:
"The Court: If the jury should convict the defendant of capital murder, the same jury would be brought back to perform a second phase of the trial which would be the sentencing phase. Okay?
"[Prospective juror J.B.]: Yes.
"The Court: And the State would be given an opportunity to present evidence and present what are called aggravating circumstances. The defendant will be given an opportunity to present evidence and if the defendant elects to present evidence, they will be allowed to present what are called mitigating circumstances. I will charge you on the law, on the aggravating circumstances the law says you can consider and the mitigating circumstances the law says you can consider. And I will charge you on the law and give you instructions on how the law says you balance and weigh those against each other, etc. You would take all of the evidence along with the aggravating circumstances and the mitigating circumstances. If you find that the aggravating circumstances  I will charge you on the burden of proof in that phase.
"If you find that the aggravating circumstances outweigh the mitigating circumstances and the evidence suggests, in your opinion, that the appropriate sentence would be death, death by electrocution, could you join the other jurors and recommend to the court the sentence of death by electrocution?
"[Prospective juror J.B.]: I think so.
"....

*949 "The Court: Okay. If the mitigating circumstances outweigh the aggravating circumstances and the jury has the opinion that the appropriate sentence should be life without the possibility of parole, could you join the other jurors and recommend that sentence?
"[Prospective juror J.B.]: Yes.
"The Court: Okay. Let me ask you a question. So you could consider both death by electrocution and life in the penitentiary without the possibility of parole; is that what you are telling me?
"[Prospective juror J.B.]: Yes.
"The Court: And based on the evidence and the aggravating circumstances, if they convince you of such, that if it rises to the level that capital punishment should be imposed, you could recommend that? Is that what you are saying?
"[Prospective juror J.B.]: Yes.
"The Court: On the other hand, if the mitigating circumstances and the evidence rises to the level that you think life in the penitentiary without the possibility of parole should be the sentence, you could also consider that, is that correct, and you could recommend that sentence?
"[Prospective juror J.B.]: Yes.
"The Court: Any questions from the State?
"[Prosecutor]: No, Your Honor.
"The Court: Any questions from the defense?
"[McNabb's counsel]: Yes, ma'am. [J.B.], what's your reasons for why you favor the death penalty?
"[Prospective juror J.B.]: I don't really know. I have just always felt that way, I guess.
"[McNabb's counsel]: Is it a long-held belief?
"[Prospective juror J.B.]: Yes. I guess I just feel that, you know, you are responsible for your actions.
"[McNabb's counsel]: Ma'am?
"[Prospective juror J.B.]: You're responsible for your actions.
"[McNabb's counsel]: I see. Is it a religious belief like an `eye for an eye'?
"[Prospective juror J.B.]: No. I really can't explain. It is just something that I have always believed. I don't know why or how. It's just that I do.
"[McNabb's counsel]: Some people think it is a deterrent to keep people from committing other crimes. Do you believe that?
"[Prospective juror J.B.]: Not necessarily.
"[McNabb's counsel]: Another possible sentence, if we ever get to this part of the trial  the first part is guilt, and the second part is to determine punishment. Another possible sentence is a sentence of life without the possibility of parole. If you were sitting on a jury and you and the other jurors, particularly you, believed that the person charged intentionally killed a police officer, if you believed that, then what do you think about life without parole as a sentence for that person?
"[Prospective juror J.B.]: That would be an option.
"[McNabb's counsel]: It is an option. I understand that. But how do you feel about that?
"[Prospective juror J.B.]: I feel that that is okay.
"[McNabb's counsel]: What do you think about life imprisonment as a punishment? Do you think it is a serious punishment?
"[Prosecutor]: Objection.
"....
"The Court: Overruled.

*950 "[McNabb's counsel]: I am just trying to get your feelings.
"[Prospective juror J.B.]: Personally, do I think it is a serious punishment?
"[McNabb's counsel]: Yes, ma'am.
"[Prospective juror J.B.]: No.
"[McNabb's counsel]: Why is that?
"[Prospective juror J.B.]: Because I think that some of the prisoners nowadays have it too soft, too easy.
"....
"[McNabb's counsel]: Yes, ma'am. If you were sitting on this jury and you believe that the person charged intentionally killed a police officer and you believe it beyond a reasonable doubt, and if you had a choice between the death penalty or life without parole, would you then automatically vote for the death penalty?
"[Prosecutor]: Object. Repetitive and argumentative.
"The Court: Sustained.
"[McNabb's counsel]: Well, let me ask you the same question. If you were sitting on a jury 
"[Prosecutor]: We object. It has been ruled on.
"The Court: Let me see how he is going to ask the question.
"[McNabb's counsel]: If you were sitting on a jury and you found the person guilty beyond a reasonable doubt of killing a police officer, would you lean toward the death penalty?
"[Prospective juror J.B.]: Yes.
"[McNabb's counsel]: You would?
"[Prospective juror J.B.]: Yes.
"[McNabb's counsel]: And in that situation, would you even consider a sentence of life without parole?
"[Prosecutor]: It has been asked and answered.
"The Court: It has been asked and answered, but I will let her answer it again. Answer, ma'am.
"[Prospective juror J.B.]: Well, I guess  you're asking me would I consider it, but you just asked me would I just lean toward the death penalty, so I think yeah, I answered that.
"[McNabb's counsel]: You would?
"[Prospective juror J.B.]: I lean toward the death penalty.
"[McNabb's counsel]: I understand that. So you wouldn't consider life without parole then; is that correct?
"[Prospective juror J.B.]: I guess not. I mean if I had a choice, it would be the death penalty.
"[McNabb's counsel]: The judge is going to tell you and [the prosecutor] may tell you also that the law says 
"[Prosecutor]: We object to his comments.
"The Court: Sustained on what [the prosecutor] and the Judge is going to tell them.
"[McNabb's counsel]: I will try to ask it this way: The law in a capital case says that the defendant gets a chance to put on mitigating circumstances, reasons why the death penalty should not be given, if assuming you got to the point as we just described. In a situation where I just described, where you were on a jury and ruled beyond a reasonable doubt that the person intentionally killed a police officer, even though the defendant put on mitigating circumstances of why they should get life without parole, would you still, regardless of what mitigating circumstances they put on, would you still vote for death is what I am trying to get at?
"[Prospective juror J.B.]: Yes.
"[McNabb's counsel]: Thank you.

*951 "[Prosecutor]: If they put on mitigating circumstances that were compelling to you and convincing, would you consider those circumstances?
"[Prospective juror J.B.]: I would consider them.
"[McNabb's counsel]: Okay. And you would consider them then if you found those mitigating circumstances they put forth were compelling enough. If that were the case, could you vote for life without parole? You don't know what any of the facts are, and I know that. This is all hypothetical and talk.
"[Prospective juror J.B.]: I guess, if that were my only choice.
"[Prosecutor]: Okay.
"[Prospective juror J.B.]: See, 
"[Prosecutor]: Let me ask the question again. I know, like I said, you have not been presented with any of the facts in this case.
"[Prospective juror J.B.]: Right.
"[Prosecutor]: I need to back up again, too. At the sentencing phase, as the Judge said, the two choices are death or life without parole. Those are the two choices that you can make.
"[Prospective juror J.B.]: Yes.
"[Prosecutor]: If the defense offered evidence of mitigating circumstances and you found those mitigating circumstances compelling, would you consider those circumstances?
"[Prospective juror J.B.]: I would consider them, but I mean 
"[Prosecutor]: If you 
"[McNabb's counsel]: Let her finish the answer to the question.
"The Court: Go ahead with the question.
"[Prosecutor]: If you found them compelling, could you vote for life without parole, if the Judge instructed you that was the law?
"[Prospective juror J.B.]: Yeah.
"[Prosecutor]: Okay. The feeling that you have, this leaning that you have, can you put that aside and follow the court's instructions?
"[Prospective juror J.B.]: Yes.
"[Prosecutor]: Okay.
"....
"The Court: [J.B.], listen to the question I am going to ask you. Do you think your views on capital punishment would prevent or substantially impair the performance of your duties as a juror in accordance with the instructions I give you and the oath you have taken?
"[Prospective juror]: No.
"The Court: Thank you, ma'am.
"[McNabb's counsel]: May I ask a question?
"The Court: Go ahead.
"[McNabb's counsel]: Let's get back to the question I asked you.
"The Court: We're not going to repeat any questions. I am going to tell both sides that. I have been very tolerant because this is a serious case and you can ferret out all of the information a prospective juror may have, but I won't consider 
"[McNabb's counsel]: Considering what the court just asked you and the questions [the prosecutor] just asked you, would your answer still be what you gave me earlier, that in the case that I described, you would vote for death?
"[Prosecutor]: We object.
"....
"The Court: I will let her answer that.
"[McNabb's counsel]: Yes, ma'am.
"[Prospective juror J.B.]: Maybe I'm not following you, but your question, the way it is worded, leads me to believe I have a choice of this or this.

*952 "[McNabb's counsel]: Yes, ma'am.
"[Prospective juror J.B.]: I am telling you I would choose this.
"[McNabb's counsel]: Would your answer be the same as it was, considering the things the judge just asked you and what they just asked you?
"[Prosecutor]: Your Honor 
"[McNabb's counsel]: If you had a choice in that situation, you answered me earlier it would be death. Would it still be death?
"[Prospective juror J.B.]: Yes.
"[Prosecutor]: Excuse me. But we do object because he never in his question said what the mitigating circumstances were.
"[McNabb's counsel]: I said from what you asked and from what the judge asked.
"The Court: I understand, the potential juror does not  she satisfied the court. Don't discuss the questions we asked back here with anyone.
"(Juror exits room.)"
(R. 1425-39.)
The portion of the record quoted above clearly shows that J.B. was confused. During the initial questioning by the trial court, J.B. indicated that she could vote for the death penalty or for life imprisonment without parole, depending on the circumstances shown by the evidence and the law that was explained to her. During the beginning of questioning by McNabb's counsel, J.B. stated that life imprisonment without parole would be a sentencing option she would consider. Despite these answers, McNabb's counsel continued questioning J.B. about her views on capital punishment. When asked ambiguous and misleading questions by McNabb's counsel about whether she would vote for the death penalty even if he had presented evidence of mitigating circumstances, she replied that she would. However, when asked whether she could set aside her preference for the death penalty and obey the trial court's instructions, she unequivocally stated that she could. Affording the trial court's ruling proper deference, we cannot say that the trial court erred in denying McNabb's challenge for cause as to prospective juror J.B.

B.
McNabb contends that the trial court erred in denying his challenge for cause as to prospective juror R.W.
The record reflects that R.W., like J.B., when questioned by the trial court concerning his views on capital punishment, indicated that he could consider both life imprisonment without the possibility of parole and death as possible sentences. McNabb's counsel then questioned R.W. as follows:
"[McNabb's counsel]: What do you think about life in prison without parole as a possible sentence in a capital case where you had no doubt about the guilt, if you thought he was guilty?
"[Prospective juror R.W.]: If it was, like I say, 100 percent, I don't agree with that.
"[McNabb's counsel]: You don't agree with life without parole?
"[Prospective juror R.W.]: No, sir.
"[McNabb's counsel]: And if you were sitting on a jury and if you and the jurors believed beyond a reasonable doubt that a person was guilty of killing a police officer, then, in that case, where you wouldn't have any doubt about the guilt, then you automatically would vote for death?
"[Prospective juror R.W.]: Yes.
"[McNabb's counsel]: You would automatically vote for death?

*953 "[Prospective juror R.W.]: Yes.
"[McNabb's counsel]: You do understand that the law of Alabama in a capital case has both options, life without parole or death? You do understand that?
"[Prospective juror R.W.]: Yes.
"[McNabb's counsel]: And you understand that the judge will tell you that the defendant can put on reasons why, even if he has been convicted of an intentional murder of a police officer, he can still put on reasons why he shouldn't be killed, like his age or he might be drinking at the time or something like that?
"[Prospective juror R.W.]: Right.
"[McNabb's counsel]: And the law is you have to consider the mitigating circumstances.
"[Prospective juror R.W.]: Yes.
"[McNabb's counsel]: Is what you are telling us, regardless of whatever mitigating circumstances the defendant puts up, that if it's an intentional killing and you are convinced beyond a reasonable doubt that the person did this, then you would automatically vote for death?
"[Prospective juror R.W.]: Right.
"[McNabb's counsel]: Is that what you are saying? Regardless of the law? Are you telling me that even though you have an oath as a juror to follow the law 
"[Prospective juror R.W.]: Yes.
"[McNabb's counsel]: But you also have the right to vote your independent judgment about the death penalty. Are you telling me that you would never vote for life imprisonment without parole?
"[Prospective juror R.W.]: Not if I was 100 percent sure."
(R. 1074-77.) The prosecutor then questioned R.W. as follows:
"[Prosecutor]: You have been following the judge's instructions so far, haven't you?
"[Prospective juror R.W.]: Yes.
"[Prosecutor]: You don't know the facts in this case, do you?
"[Prospective juror R.W.]: Just from what I stated the first time of what I knew.
"[Prosecutor]: Well, you haven't heard the trial, have you?
"[Prospective juror R.W.]: No.
"[Prosecutor]: You haven't heard whatever evidence the State and the defense will give you about what the appropriate punishment should be?
"[Prospective juror R.W.]: No.
"[Prosecutor]: You haven't heard what the law is yet?
"[Prospective juror R.W.]: No.
"[Prosecutor]: The question we all want to know is: Can you be fair to both sides?
"[Prospective juror R.W.]: Yes.
"[Prosecutor]: Now, in order for you to be fair to both sides, that means you have to be able to vote either for death or life without parole?
"[Prospective juror R.W.]: Yes.
"[Prosecutor]: If the jury finds the defendant guilty.
"[Prospective juror R.W.]: Right.
"[Prosecutor]: Now, you have some opinions that you walked in here with, just like everybody else.
"[Prospective juror R.W.]: Right.
"[Prosecutor]: The question then becomes: Can you set aside your personal opinions, your feelings, and listen to the facts and listen to the law and follow the law?
"[Prospective juror R.W.]: Yes.
"[Prosecutor]: Okay. If you can follow the law, then could you vote for life *954 without parole, depending on what the facts were?
"[Prospective juror R.W.]: Yes.
"[Prosecutor]: Could you vote for life without parole even if the defendant were convicted of an intentional killing, depending on what the facts are?
"[Prospective juror R.W.]: Depending on the facts.
"[Prosecutor]: Okay. It's been clear that you lean toward death given only knowing the intentional killing of a police officer. You don't know any of the other factors?
"[Prospective juror R.W.]: Yes.
"....
"[Prosecutor]: Can you set aside your leaning, your tendency, and try to be straight up and make your decision just on what happens in the court?
"[Prospective juror R.W.]: Yes.
"[Prosecutor]: I want to ask you one last question then. Can you follow the judge's instructions and consider fairly both death and life without parole and weigh fairly the evidence and follow the law before you vote on which would be appropriate?
"[Prospective juror R.W.]: Yes."
(R. 1077-80.) McNabb's counsel then again questioned R.W. and again R.W. indicated that he would "automatically vote death" if he was one hundred percent sure about the defendant's guilt. (R. 1081.) The trial court then questioned R.W. as follows:
"The Court: You would have to hear the evidence before you decide whether you are 100 percent sure?
"[Prospective juror R.W.]: Yes, sir.
"The Court: And could you take the mitigating circumstances and weigh the mitigating circumstances against the aggravating circumstances?
"[Prospective juror R.W.]: Yes, sir.
"The Court: And render an appropriate sentence?
"[Prospective juror R.W.]: Yes, sir.
"The Court: Do you think your views on capital punishment would prevent or substantially impair you in performing your duties as a juror in accordance with the instructions I give you and the oath that you take?
"[Prospective juror R.W.]: No."
(R. 1081-82.)
It appears that R.W. answered "yes" to virtually every question put to him. At one point, he stated that he could set aside his personal feelings and follow the law; at yet another point, however, he indicated that he would automatically impose the death penalty, regardless of the law. The credibility of juror R.W.'s answers is the sole issue here. As noted above, in such a case, we must give the trial court's ruling great deference on appeal because the trial court was in the unique position of observing R.W.'s demeanor during voir dire. We will not substitute our judgment, which is based solely on a cold record, for the judgment of the trial court, which was based on personal observation. After reviewing the record and the contradictory responses given by R.W. during voir dire, we simply cannot say that the trial court abused its discretion in refusing to grant McNabb's challenge for cause as to prospective juror R.W.

C.
McNabb contends that the trial court erred in denying his challenge for cause as to prospective juror M.M.
During the trial court's initial questioning, prospective juror M.M. stated that he believed in the death penalty but that he could also consider a sentence of life imprisonment *955 without parole. As with prospective jurors J.B. and R.W., M.M. stated that he would follow the court's instructions and the law and that his personal feelings about the death penalty would not impair his ability to perform his duties as a juror or to obey his oath. McNabb's counsel then questioned M.M. as follows:
"[McNabb's counsel]: ... The court will tell you that under your oath as a juror, you have a duty to consider what they call mitigating circumstances. That would be a reason why you might find a person you found guilty should not receive the death penalty, things such as the age of the defendant, a prior record, whether the person was on drugs or intoxicated at the time he committed the crime, and that kind of thing. Would you believe that a person should, as I guess you said, if they were found guilty, they should automatically be put to death and not life without parole? Would your belief in the death penalty prevent you from considering these possible mitigating factors that would, under the law, say they might get life without parole? Would your feelings of the death penalty be so strong that you would not consider those?
"[Prospective juror M.M.]: I would consider the age of the individual.
"[McNabb's counsel]: How would that make a difference?
"[Prospective juror M.M.]: Well, I would feel if he was not an adult or if she is not an adult, then they might not know exactly what they were doing.
"[McNabb's counsel]: Sure. But if the person was an adult, over 18 years old, and 
"[Prospective juror M.M.]: And they were in their right mind and knew what they were doing, yeah, I would agree with the death penalty.
"[McNabb's counsel]: I see. So is what you are telling me, because I want to be sure I understand you, that even though the court might tell you that the law is that there are mitigating factors and reasons why you could recommend life without parole, such as the balance of the aggravating circumstances and mitigating circumstances together, such as age and things of that nature, it would be your opinion if the person is an adult, you can't think of any other, to your knowledge  pardon me. Let me back up and state it this way: You would automatically vote for the death penalty. Is that what you are saying?
"[Prospective juror M.M.]: Yes, sir, that's right."
(R. 590-92.) When the prosecutor then questioned M.M., the following occurred:
"[Prosecutor]: My question is: If the court instructs you that you are to consider certain mitigating circumstances that the evidence has shown, could you consider those circumstances?
"[Prospective juror M.M.]: Yes.
"[Prosecutor]: If you feel that those circumstances outweigh any aggravating circumstances that the State put forth calling for the death penalty, could you vote for life without parole?
"[Prospective juror M.M.]: Yeah.
"[Prosecutor]: I know we are asking you about something that we don't know about yet.
"[Prospective juror M.M.]: I guess so. There would be a lot of factors in it, you know. But I guess I do feel strongly about the death penalty, if somebody is, like I say, an adult and knowingly did it, you know, I would lead toward that.
"[Prosecutor]: You said you would lean toward that. Could you put that leaning aside and follow the instructions by the court?

*956 "[Prospective juror M.M.]: Yes, sir.
"[Prosecutor]: So, if the evidence warranted it, even though you do lean toward the death penalty, you could vote for life without parole if the evidence showed it?
"[Prospective juror M.M.]: Yes.
"....
"[Prosecutor]: Even if you have this strong opinion, do you think you could put that aside and follow what the court says?
"[Prospective juror M.M.]: Yes."
(R. 593-95.) McNabb's counsel then questioned M.M. yet again, during which M.M. stated that his "personal opinion" was a preference for the imposition of the death penalty whenever an adult intentionally kills another person. (R. 596.) Finally, the trial court questioned M.M., as follows:
"The Court: Can you follow the instructions of the court?
"[Prospective juror M.M.]: Yes, sir, I could.
"The Court: If the evidence, in your opinion, under the sentencing phase, if you get to the sentencing phase, warranted the death penalty, could you vote for the death penalty?
"[Prospective juror M.M.]: Yes, sir, I could.
"....
"The Court: ... If you find that the evidence  and I will give you the instruction that if you find the evidence warrants the death penalty, in your opinion, based on those factors or weighing them, etc., and following the instructions of the court, could you recommend the death penalty?
"[Prospective juror M.M.]: Yes, sir, I could.
"The Court: If you find that the evidence does not warrant the death penalty after weighing those factors and the instructions I give you but warrants life without parole, could you recommend life without parole?
"[Prospective juror M.M.]: Yes, sir."
(R. 596-98.)
Although juror M.M. indicated that he favored the death penalty, he also stated unequivocally that he could set his personal opinion aside and follow the court's instructions. As noted above, "'"a preference [toward imposing the death penalty], where the potential [juror] indicates that he or she could nonetheless consider life imprisonment without parole is not improper and it does not indicate that the juror is biased."'" Hagood v. State, 777 So.2d 162, 175 (Ala.Crim.App.1998), aff'd in pertinent part, rev'd on other grounds, 777 So.2d 214 (Ala.1999), on remand to, 777 So.2d 221 (Ala.Crim.App.2000), opinion after remand, 777 So.2d at 223 (Ala.Crim.App.2000), quoting Price v. State, 725 So.2d 1003, 1024 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999), quoting, in turn, Smith v. State, 698 So.2d 189 (Ala.Crim.App.1996), aff'd, 698 So.2d 219 (Ala.1997), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997). The trial court did not err in denying McNabb's challenge for cause as to prospective juror M.M.

D.
McNabb contends that the trial court erred in denying his challenge for cause as to prospective juror L.R.
The record reflects that when the trial court initially questioned L.R., he stated that he had no thoughts about the death penalty before coming to court. When asked if he could vote for the death penalty if the aggravating circumstances outweighed the mitigating circumstances, he stated that he could. When asked if he *957 could vote for life imprisonment without the possibility of parole if the mitigating circumstances outweighed the aggravating circumstances, he stated that he preferred the death penalty over life imprisonment without parole because he thought there were too many people in prison "just sit[ting] there for life" and that he didn't like that, but that he "believe[d] [he] could" vote for life imprisonment without parole if the evidence warranted it. (R. 787-88.) In addition, L.R. stated that his views on capital punishment would not impair his duties as a juror. When questioned by the prosecutor, L.R. stated that he could be fair to both sides and that he could vote for a sentence of life imprisonment without parole. When questioned by McNabb's counsel, the following occurred:
"[McNabb's counsel]: ... But if you are convinced, regardless of any mitigating circumstances, it might be age or whatever it might be in the case, but regardless of whatever mitigating circumstances put forth, do you believe that if a person killed a police officer in the line of duty intentionally, do you believe beyond a reasonable doubt and regardless of the mitigating circumstances, you would vote death; is that right?
"[Prospective juror L.R.]: Well, I've got 11 more people I'm going to be talking to. I mean, the evidence is going to be here when we come in here to judge the man. I mean, you know, we are going to sit and talk like we always have. You know, I've been on cases before. I'd do the best I can is all I can tell you. But if everybody agrees that he should, you know, spend life, then, you know, I don't know if my vote  what is it, half and half?
"The Court: No.
"[Prospective juror L.R.]: Sixty/forty?
"The Court: It's a little bit more than that.
"[Prospective juror L.R.]: One hundred percent? I don't know.
"The Court: I don't want to tell you right now.
"[McNabb's counsel]: I understand that.
"[Prospective juror L.R.]: I am just saying 
"[McNabb's counsel]: But your personal views 
"[Prospective juror L.R.]: If he shot the man, I think he should  I think he should die. That's just me.
"[McNabb's counsel]: That's how you would view it?
"[Prospective juror L.R.]: Yes, sir.
"[McNabb's counsel]: The verdict is an individual verdict. And after you have listened to all of the other jurors, if you believe he shot the man 
"[Prospective juror L.R.]: If I believe he 
"The Court: Wait a minute.
"[McNabb's counsel]: If he intentionally killed him, would you at that point, regardless of what mitigating circumstances might be put up, regardless of what the other jurors might say, you're saying it's your view that if he shot the man intentionally and killed him, and you believe that beyond a reasonable doubt, regardless of the mitigating circumstances that might be put up, would you vote death?
"[Prospective juror L.R.]: Right. I'll just tell you. Yes, sir.
"[McNabb's counsel]: I appreciate your honesty.
"The Court: Could you follow the instructions from the court?
"[Prospective juror L.R.]: Sir?
"The Court: Could you follow the instructions I give you?
"[Prospective juror L.R.]: Yes, sir.

*958 "The Court: Could you cast your verdict in accordance with that instruction?
"[Prospective juror L.R.]: Yes, sir.
"The Court: Okay. And if I understand you correctly, you are a strong advocate of the death penalty?
"[Prospective juror L.R.]: Yes, sir.
"The Court: But being a strong advocate of the death penalty would not prevent you in the proper situation for voting for a sentence of life in the penitentiary without parole?
"[Prospective juror L.R.]: If the evidence is there.
"The Court. Thank you.
"[McNabb's counsel]: May I ask another question? Understanding what the judge just told you, understanding what the judge just told you with what the law is on mitigating circumstances, is your answer still that your individual opinion is if you believed he intentionally killed a police officer, regardless of any mitigating factors that you might hear, if he intentionally killed a police officer and you believe beyond a reasonable doubt 
"[Prospective juror L.R.]: Unless there was nothing else and that was just it.
"[McNabb's counsel]: Right.
"[Prospective juror L.R.]: If he just shot the man and everybody seen it, that's it, for me.
"[McNabb's counsel]: And regardless of whatever mitigating circumstances 
"[Prospective juror L.R.]: Well, I don't know until I get there. I've never done that before."
(R. 791-95.) When questioned again by the prosecutor, L.R. responded as follows:
"[Prosecutor]: Despite everything he said, though, the question is this: If the law says that you are to consider the mitigating circumstances that have been put before you, can you consider them?
"[Prospective juror L.R.]: Right. I could do that.
"[Prosecutor]: If you felt they outweigh the aggravating circumstances, could you vote for life without parole?
"[Prospective juror L.R.]: Right. I can do that."
(R. 796-97.)
Contrary to McNabb's contention, prospective juror L.R. never stated that he would automatically vote for the death penalty regardless of the circumstances. In fact, when specifically asked such a question by McNabb's counsel, L.R. stated "I don't know until I get there." L.R. stated several times that he could vote for life imprisonment without the possibility of parole and that he could set aside his opinions and follow the law as instructed by the court. The trial court did not err in denying McNabb's challenge for cause as to prospective juror L.R.

E.
McNabb contends that the trial court erred in denying his challenge for cause as to prospective juror R.B.
During initial questioning by the trial court, R.B. indicated that he had a preference for the death penalty based on his religious views. However, R.B. stated that he could consider both the death penalty and life imprisonment without parole as possible sentences and that he could consider the evidence of aggravating circumstances and of mitigating circumstances, weigh that evidence, and recommend an appropriate sentence. When questioned by McNabb's counsel, R.B. stated that he believed the death penalty had a deterrent effect, and that a sentence of life imprisonment without parole "costs the State a lot of money to deter somebody who has committed a crime, and I don't believe that we should spend our money *959 housing an individual, paying for them for the length of their life, just to keep them incarcerated." (R. 1448-49.) The following then occurred:
"The Court: Could you consider life in the penitentiary without parole?
"[Prospective juror R.B.]: Mitigating circumstances?
"The Court: The law sets those out and tells the jury what they can consider.
"[McNabb's counsel]: The age of the defendant.
"The Court: The laws sets them out, and I will charge you on what they are. The question is: Could you consider life in the penitentiary without the possibility of parole?
"[McNabb's counsel]: In a situation like I described.
"[Prospective juror R.B.]: Sure. I mean, If there were circumstances that were reasonable.
"The Court: Any further questions?
"[McNabb's counsel]: Yes, sir. Do you still hold the view that  and I don't want to misstate what you are saying. But your belief is you would not sentence a person in an intentional killing with life without parole because you don't feel the State should pay the money to feed them? Is that what you are telling us?
"[Prospective juror R.B.]: Well, I just think the money could be used for many better things, educating children, for one, rather than housing criminals who intentionally kill other people who should receive the death penalty instead.
"[McNabb's counsel]: Thank you.
"The Court: Could you follow the instructions that I give you?
"[Prospective juror R.B.]: Yes, sir.
"The Court: Could you weigh the evidence as I instruct you on the way the law says you should and recommend an appropriate sentence whether you find it to be death by electrocution or life in the penitentiary without the possibility of parole? Could you do that?
"[Prospective juror R.B.]: Yes, sir."
(R. 1451-53.)
Prospective juror R.B. stated that he could recommend both the death penalty or a sentence of life imprisonment without parole, depending on the circumstances, and that he could follow the law as it was instructed by the trial court. The trial court did not err in denying McNabb's challenge for cause as to prospective juror R.B.

F.
Finally, McNabb contends that the trial court erred in denying his challenge for cause as to prospective juror T.S.
The record reflects that prospective juror T.S., when initially questioned by the trial court, stated that he could follow the law and that he could consider both life imprisonment without the possibility of parole and death as possible sentences. McNabb's counsel then began questioning T.S. by insinuating that T.S. had previously said that he was predisposed toward the death penalty; T.S., however, had made no such statement. The following occurred:
"[McNabb's counsel]: Tell us your views on the death penalty? For what reason do you favor the death penalty?
"[Prospective juror T.S.]: Well, I feel like if a person has committed murder, I feel like he deserves the death penalty. He needs to pay the consequences.
"[McNabb's counsel]: If you were on a jury and you believed beyond a reasonable doubt that the person on trial intentionally killed a police officer, and in that case, when there is no doubt about the guilt in your mind and he intentionally killed a police officer, in those kinds of *960 cases, would you automatically vote for the death penalty?
"[Prospective juror T.S.]: Well, after hearing all of the evidence, I would, yes.
"[McNabb's counsel]: If you believed that he was guilty beyond a reasonable doubt?
"[Prospective juror T.S.]: Right.
"[McNabb's counsel]: Do you understand that there is another sentence, life without parole?
"[Prospective juror T.S.]: Right.
"[McNabb's counsel]: That's a possibility of a sentence.
"[Prospective juror T.S.]: Right.
"[McNabb's counsel]: If you sat on a jury and you believed the person intentionally killed the police officer, you believed it beyond a reasonable doubt, would you consider life without parole or would you consider the death penalty? Which one?
"[Prospective juror T.S.]: I would consider the death penalty.
"[McNabb's counsel]: The Court will tell you that under the law, you should consider reasons why the death penalty wouldn't be appropriate, like in mitigating circumstances, but even though the Court would tell you that and even though you agreed and I am sure you would follow the law.
"[Prospective juror T.S.]: Right.
"[McNabb's counsel]: But even though the Court would tell you that and even though you would agree and you did agree to follow the law, still, your opinion would be if a person intentionally killed a police officer, that you would automatically vote death; is that correct?
"[Prospective juror T.S.]: Yes.
"[McNabb's counsel]: Thank you, sir.
"....
"[Prosecutor]: We'd put on evidence of what we call aggravating circumstances. Those would be facts that the State would contend call for the death penalty. The defendant will be, in defense, putting on evidence of mitigating circumstances. Those would be facts that would call for a sentence of life without parole. My question is this: Can you listen fairly to both sides?
"[Prospective juror T.S.]: Yes.
"[Prosecutor]: Would you listen to what the State's evidence would be?
"[Prospective juror T.S.]: Sure.
"[Prosecutor]: Would you listen to what the defense's evidence would be?
"[Prospective juror T.S.]: Sure.
"[Prosecutor]: Would you listen to what the court instructed?
"[Prospective juror T.S.]: Yes.
"[Prosecutor]: And if the Court instructed you that you are to consider this evidence as aggravating circumstances, could you follow the Court's instructions?
"[Prospective juror T.S.]: Sure.
"[Prosecutor]: And if the Court said you are to consider these factors as mitigating circumstances, could you consider those?
"[Prospective juror T.S.]: Sure.
"[Prosecutor]: If you found that the aggravating circumstances outweigh the mitigating circumstances, could you vote for the death penalty?
"[Prospective juror T.S.]: Sure.
"[Prosecutor]: If you found that the mitigating circumstances outweigh the aggravating circumstances, could you vote for life without parole?
"[Prospective juror T.S.]: Sure.
"[Prosecutor]: So you could set aside your personal feelings and follow the *961 Court's instructions and the law and the facts of the case?
"[Prospective juror T.S.]: Sure.
"....
"[McNabb's counsel]: [T.S.], considering everything that [the prosecutor] has just told you, everything that he has told you and you agree that you would consider those things, if you found a person guilty of intentionally killing a police officer beyond a reasonable doubt, considering all of the mitigating circumstances, no matter what they may be, and having the possibility of life without parole and that's a possible sentence, you would still automatically vote death? Is that what you are telling me?
"[Prospective juror T.S.]: Yes.
"[McNabb's counsel]: Thank you.
"....
"The Court: Let me ask you this question: Are you saying not knowing the facts in this case but just generally speaking, if one intentionally killed a police officer, although there may be some mitigating circumstances that outweigh the aggravating circumstances, you would still vote for the death penalty?
"[Prospective juror T.S.]: Not necessarily."
(R. 849-56.) (Emphasis added.)
T.S. indicated that he could follow the law as instructed by the trial court and that he could vote for both life imprisonment without parole or death, depending on the circumstances. When questioned by McNabb's counsel as to what his personal opinion as to the possible sentences would be if he found someone guilty of capital murder, T.S. stated that he would "automatically vote death"; however, this question dealt only with T.S.'s personal feelings, uninhibited by law or evidence. When asked whether he could set aside those personal opinions on the death penalty and render a verdict based on the law and the evidence, T.S. unequivocally stated that he could. Therefore, we find no abuse of discretion in the trial court's denial of McNabb's challenge for cause as to prospective juror T.S.

II.
McNabb contends that the trial court erred in refusing to grant his challenges for cause as to three prospective jurors who, he argues, were biased against him. (Issue II in McNabb's brief.)
"`To justify a challenge for cause, there must be a proper statutory ground or "`some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court.'" Clark v. State, 621 So.2d 309, 321 (Ala.Crim.App.1992) (quoting Nettles v. State, 435 So.2d 146, 149 (Ala.Crim.App.1983)). This Court has held that "once a juror indicates initially that he or she is biased or prejudiced or has deep-seated impressions" about a case, the juror should be removed for cause. Knop v. McCain, 561 So.2d 229, 234 (Ala.1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So.2d 73, 82 (Ala.1995). A juror "need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it." Kinder v. State, 515 So.2d 55, 61 (Ala.Crim.App.1986). Even in cases where a potential juror has expressed some preconceived opinion as to the guilt of the accused, the juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based upon the *962 evidence in the case. Kinder, at 60-61. In order to justify disqualification, a juror "'must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused'"; "`such opinion must be so fixed ... that it would bias the verdict a juror would be required to render.'" Oryang v. State, 642 So.2d 979, 987 (Ala.Crim.App.1993) (quoting Siebert v. State, 562 So.2d 586, 595 (Ala.Crim.App.1989)).'"
Whitehead v. State, 777 So.2d 781, 808 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001), quoting Ex parte Davis, 718 So.2d 1166, 1171-72 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999). We address each of McNabb's claims in turn.

A.
First, McNabb contends that the trial court erred in denying his challenge for cause as to prospective juror J.M.
The record reflects that voir dire was conducted during December 1998. At the conclusion of voir dire, but before the jury was struck, the court recessed for the Christmas holidays. When the prospective jurors returned on January 4, 1999, from the holiday adjournment, the court asked if the jurors had followed the instructions not to read or to listen to anything about the case and not to discuss the case with anyone. Two prospective jurors responded that they had not followed the court's instructions, including prospective juror J.M. When J.M. was questioned individually, the following occurred:
"The Court: [J.M.], when I asked the question: Is there anyone who did not comply with the instructions I gave you, to not discuss with anyone anything about the case or if you had heard anything about the case over the holidays, you raised your hand. Will you tell us what you heard?
"[Prospective juror J.M.]: Well, I had contracted for a house-sitting job before this started in December. The house sitting was supposed to begin yesterday with my  these are friends and I do this work for them quite often. I said I can't say yes or no because the Judge refused to say yes or no. And then the person who was going to employ me for that job said well, I don't see how you can be picked for this jury when your son-in-law was in the previous trial with the same defendant. That certainly colors my attitude toward the innocence of him.
"The Court: Who is your son-in-law?
"[Prospective juror J.M.]: My son-in-law is Dr. [L.W.]
"The Court: And did Dr. [L.W.] say he was on the jury?
"[Prospective juror J.M.]: I asked him. He said he thought yes, that that was the case that was up for trial when he was on the jury squad, but he was  he couldn't remember actually being on the jury. He was an alternate for that.
"The Court: What kind of case? Did he tell you what the defendant was charged with?
"[Prospective juror J.M.]: Something about a deadly weapon. I can't remember the terms.
"The Court: Now, has that destroyed  hearing that, has that destroyed your impartiality in that if you were selected to sit on the jury, you could not render a fair and an impartial verdict based on the evidence and the law?
"[Prospective juror J.M.]: I certainly can't presume him to be innocent when he is a repeat offender or is alleged to be.

*963 "The Court: Did your son say whether [the verdict] was guilty or not guilty?
"[Prospective juror J.M.]: No, he didn't, and I don't read the local paper.
"The Court: So if he were found not guilty, he is not a repeat offender.
"[Prospective juror J.M.]: That's true.
"The Court: Any questions from the State?
"[Prosecutor]: No, sir.
"The Court: Any questions from the defense?
"[McNabb's counsel]: No questions at this point.
"The Court: Return to the courtroom. Don't discuss with anyone the questions we discussed with you back here.
"(Juror exits room.)
"The Court: All right.
"[McNabb's counsel]: We would move to strike that juror.
"The Court: Okay. Denied. Was he convicted of a weapon [charge] or anything?
"[Prosecutor]: No, sir. It was a mistrial.
"[McNabb's counsel]: Probably what she was talking about is he had a receiving-stolen-property charge involving a pistol. It was a hung jury. He was convicted of possession of cocaine.
"[Prosecutor]: That was a separate trial with a separate jury.
"The Court: The son-in-law was not on the drug charge then?
"[McNabb's counsel]: I don't know.
"The Court: He said there was one with a pistol.
"[McNabb's counsel]: I don't know.
"The Court: Motion denied.
"[McNabb's counsel]: Your Honor, as grounds, we cite the Sixth and the Fourteenth Amendments, that this juror would not be a fair and impartial juror.
"The Court: Motion denied."
(R. 1659-63.)
We need not address whether the trial court's denial of McNabb's challenge for cause as to prospective juror J.M. was error because, even if it was, it was harmless. The record reflects that the State used one of its peremptory strikes to remove J.M. from the jury. "Having the questionable juror struck by the State left [McNabb] in a better position than he would have been in had the trial court [removed J.M. for cause], because it left the State with one less strike. Any possible error here would clearly be harmless." Ex parte Jones, 520 So.2d 553, 554 (Ala.), cert. denied, 488 U.S. 871, 109 S.Ct. 182, 102 L.Ed.2d 151 (1988). See also Whitehead v. State, supra.

B.
Second, McNabb contends that the trial court erred in denying his challenge for cause as to prospective juror R.B. who, McNabb argues, indicated that she had a fixed opinion that McNabb was guilty.
During individual voir dire of prospective juror R.B., the following occurred:
"The Court: [R.B.], I told the jury venire yesterday that the defendant is charged with three criminal offenses, two assaults with intent to murder and one capital murder. I told you the matter allegedly occurred on September 24, 1997.
"Had you heard anything about this case before you came to jury duty?
"[Prospective juror R.B.]: Yes.
"The Court: Tell me what you had heard.
"[Prospective juror R.B.]: Well, I've hear it on the news and in the paper, and I've read quite a bit about it.

*964 "The Court: Tell me basically what you recall reading about it or hearing about it?
"[Prospective juror R.B.]: That he shot the police officer.
"The Court: That he was arrested for shooting a police officer?
"[Prospective juror R.B.]: Right.
"The Court: Do you remember anything else?
"[Prospective juror R.B.]: No.
"The Court: Now, if you were selected to sit on this jury and you are to take the evidence brought before you in this courtroom, could you put aside what you have heard and have read in the newspaper and render your verdict based on the evidence that is brought before you in the courtroom?
"[Prospective juror R.B.]: No, I don't think so.
"The Court: So you have already made up your mind about the guilt or innocence?
"[Prospective juror R.B.]: Right.
"The Court: Although you haven't heard any evidence?
"[Prospective juror R.B.]: Right, because I have a son, too.
"The Court: And solely because he was arrested, you are saying this is the person?
"[Prospective juror R.B.]: Right. I think so.
"The Court: You say you think you could.
"[Prospective juror R.B.]: Yes.
"The Court: Okay. And so your 
"[Prospective juror R.B.]: My mind is already made up.
"The Court: And what is that?
"[Prospective juror R.B.]: Guilty.
"The Court: Anything from the State?
"[Prosecutor]: [R.B.], you obviously come in here today having heard something about it, and you have an opinion. The law says the defendant is presumed to be innocent. It also says that the burden of proof is on the State of Alabama to prove it to the jury's satisfaction beyond their [sic] reasonable doubt. Do you understand those two principles?
"[Prospective juror R.B.]: Right.
"[Prosecutor]: Do you agree with them?
"[Prospective juror R.B.]: Yes.
"[Prosecutor]: Can you follow them?
"[Prospective juror R.B.]: Well, halfway.
"[Prosecutor]: Okay. If the State were to prove what you have heard and read, could you vote guilty?
"[Prospective juror R.B.]: Yes.
"[Prosecutor]: And I am not asking you to prejudge it.
"[Prospective juror R.B.]: Yes.
"[Prosecutor]: What if we didn't prove beyond a reasonable doubt that this defendant did what he is accused of, could you vote guilty, not guilty, or do you know?
"[Prospective juror R.B.]: No. I think I could have an open mind to that.
"[Prosecutor]: Okay.
"[Prospective juror R.B.]: If he wasn't guilty and if it wasn't proven, I could go along with that.
"[Prosecutor]: Okay. So even though you may have something in your head, you could put it aside and vote based on the evidence in the courtroom?
"[Prospective juror R.B.]: Well, I don't know.
"[Prosecutor]: Can you explain your answer?
"[Prospective juror R.B.]: Maybe I've heard too much.
"[Prosecutor]: What have you heard?

*965 "[Prospective juror R.B.]: Well, read too much in the paper, really.
"[Prosecutor]: What is it that has got your mind made up?
"[Prospective juror R.B.]: It just seems like a useless killing, unnecessary.
"[Prosecutor]: Right. Would you require the State to prove that?
"[Prospective juror R.B.]: Yes.
"[Prosecutor]: Do you believe everything you read and hear?
"[Prospective juror R.B.]: Well, no, not really.
"[Prosecutor]: Okay.
"[Prospective juror R.B.]: But that should be the truth.
"[Prosecutor]: That's the point. It could be the truth. If the State didn't prove it, would you base your verdict on what you have heard and read, or on what was proven in court?
"[Prospective juror R.B.]: No, what was proven in court."
(R. 1305-10.) The trial court denied McNabb's challenge for cause as to prospective juror R.B. because, the court said, juror R.B. "said she could base her opinion on what is proven in court and set the other aside." (R. 1311.) The trial court's finding is supported by the record.
Although R.B. initially stated that she believed McNabb was guilty based on what she had read and heard about the case and that she could not set aside that opinion and base her verdict on the evidence presented at trial, she later stated that she would base her verdict on "what was proven in court" and not on what she had heard or read about the case. McNabb argues R.B.'s later statement  that she would base her verdict on the evidence and not on what she had read and heard  was merely a "canned pro forma" response by R.B. and, therefore, should be discounted by this Court. (McNabb's brief at p. 61.) We disagree. Ambiguous and contradictory answers are not unusual during voir dire. In Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), the United States Supreme Court stated:
"The testimony of each of the three challenged jurors is ambiguous and at times contradictory. This is not unusual on voir dire examination, particularly in a highly publicized criminal case. It is well to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination tactics that frequently are employed, and that were evident in this case. Prospective jurors represent a cross section of the community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially. The trial judge properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading."
467 U.S. at 1038-39, 104 S.Ct. 2885. See also Bryant v. State, [Ms. CR-98-0023, November 19, 1999] ___ So.2d ___ (Ala.Crim.App.1999); Wilson v. State, 777 So.2d 856 (Ala.Crim.App.1999), aff'd, 777 So.2d 935 (Ala.2000), cert. denied, 531 U.S. 1097, 121 S.Ct. 826, 148 L.Ed.2d 709 (2001); Burgess v. State, 827 So.2d 134 (Ala.Crim.App.1998), aff'd, 827 So.2d 193 (Ala.2000); and Thomas v. State, 539 So.2d 375 (Ala.Crim.App.1988). Given R.B.'s vacillating answers and the trial court's ability to observe R.B.'s demeanor and *966 manner during voir dire, we cannot say that the trial court abused its discretion in denying McNabb's challenge for cause as to prospective juror R.B.

C.
Finally, McNabb contends that the trial court erred in denying his challenge for cause as to prospective juror C.B. on the ground that C.B. was a retired Montgomery police officer. At trial, McNabb argued the following regarding juror C.B.:
"[McNabb's counsel]: Your Honor, we move to challenge this juror because of his close connection of 20 years with the Montgomery Police Department. He's retired. Also on the basis of the law enforcement officers he said that he knew previously. And regardless of his answers to the questions of being fair and considering mitigating circumstances, that it would be difficult for a police officer in any situation to render a fair verdict. Secondly, there is not a limited number of jurors we have here, and this person, except for [another prospective juror] who was excused, has more connection with law enforcement and especially the Montgomery Police Department than any other juror. There is no limit  I mean there are enough jurors that we could get a juror that doesn't have that amount of contact. So therefore we object on the grounds 
"[McNabb's cocounsel]: That he would not be fair and impartial under the Sixth and Fourteenth Amendment and Art. 1, § 6. of the federal and state constitution.
"The Court: First of all, the court is authorized to use its own judgment as to what a potential juror would do. The Court is charged to ask questions and see whether or not the juror satisfies the court that he or she is qualified based on precedent case-law, etc. The difference is [the prospective juror that was struck for cause] said he could not be fair. He works for the Montgomery Police Department. He was part of the investigation, or at least he called one of the officers on duty and talked to him about the investigation. [C.B.] is not in that situation, so the motion is denied."
(R. 1412-13.)
The fact that C.B. was a retired Montgomery police officer was not a statutory ground for removing him for cause. See § 12-16-150, Ala.Code 1975. Therefore, proof of absolute bias on the part of C.B. was necessary to justify the challenge. See, e.g., Ray v. State, 809 So.2d 875, 885 (Ala.Crim.App.2001), cert. denied, 809 So.2d 891 (Ala.2001) ("In order to justify a challenge for cause, there must be a statutory ground or some matter that imports absolute bias or favor and leaves nothing to the discretion of the trial court."). During voir dire, C.B. stated that he had retired from the Montgomery Police Department in 1984 after 20 years of service; that he knew the chief of the Montgomery Police Department; and that he knew several of the police officers who were scheduled to testify on behalf of the State. However, C.B. never indicated that he had any bias as a result of his career in law enforcement or of his acquaintance with any of the State's witnesses. In fact, C.B. stated unequivocally that his acquaintance with several of the police officers who were scheduled to testify "would not affect [his] impartiality." (R. 1172.) There is no indication that C.B. was biased against McNabb because of his status as a retired law-enforcement officer or that he had any preconceived view of McNabb's guilt. Therefore, the trial court properly denied McNabb's challenge for cause as to prospective juror C.B.

III.
McNabb contends that the trial court erred in allowing the State to introduce *967 into evidence a booking report from the Montgomery County detention facility, a log from the Montgomery Police Department, and an arrest warrant and its accompanying affidavit, all of which indicated, in contrast to McNabb's testimony at trial, that Officer Gordon had had some contact with McNabb before his death.
The documents reflect that on February 5, 1997, approximately seven months before his death, Officer Gordon served an arrest warrant on McNabb for the felony offense of receiving stolen property; he then transported McNabb to the Montgomery County detention facility. At the time the arrest warrant was served, McNabb was in the Montgomery city jail on unrelated misdemeanor charges. The affidavit supporting the arrest warrant contained the hearsay allegations of the complainant that McNabb had received a 9mm Lorcin pistol, knowing that it was stolen. The warrant itself listed Officer Gordon as the officer who had executed the warrant.[2] The log from the Montgomery Police Department indicates that Officer Gordon transported McNabb from the Montgomery city jail to the Montgomery County detention facility on February 5, 1997, at approximately 12:15 p.m. The log is a computer printout from the Montgomery Police Department and was certified as a true and correct copy of the original log kept at the Montgomery Police Department by the officer in charge of the criminal records division of the department. Finally, the booking report from the Montgomery County detention facility indicated that McNabb arrived at the facility on February 5, 1997, at approximately 12:20 p.m., and listed "Gordon" as the arresting officer. (C. 609.) The booking report was certified as a true copy of the original report kept at the Montgomery County detention facility by the custodian of inmate records at the facility.
The record reflects that the State initially attempted to introduce the arrest warrant and the affidavit during its case-in-chief. McNabb objected, arguing that although the warrant and affidavit may be admissible under "some type of hearsay exception," their admission would violate his right to confrontation. (R. 2136.) The trial court sustained the objection, but not on confrontation grounds. The court found that the arrest warrant and the affidavit were not relevant to any issue in the case because, at that time, there had been no allegation that McNabb did not know Officer Gordon. Later, during his testimony, McNabb testified that he did not know Officer Gordon. In an effort to impeach this testimony, the State offered the arrest warrant and the affidavit during cross-examination. McNabb again objected, solely on confrontation grounds. The trial court overruled the objection, finding that the arrest warrant and the affidavit were admissible to impeach McNabb's testimony. During its rebuttal case, the State offered the booking report from the Montgomery County detention facility and the log from the Montgomery Police Department. McNabb objected to these documents as well, arguing again that their *968 admission would violate his right to confrontation. The trial court overruled the objection, finding that the documents were admissible as "official record[s]." (R. 2360.)
On appeal, McNabb argues that all of the documents were improperly admitted into evidence because, he says: (1) they violated his right to confrontation and (2) they were not properly authenticated. Because McNabb objected to the documents at trial solely on confrontation grounds, McNabb's claim on appeal that the documents were also inadmissible because they were not properly authenticated will be reviewed only for plain error. See Rule 45A, Ala.R.App.P.
"Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), Ala.R.Evid. Hearsay is not admissible unless it falls within one of the exceptions to the hearsay rule. Hearsay is generally not admissible "because it violates the right of confrontation and cross-examination guaranteed by the Sixth Amendment to the United States Constitution." James v. State, 723 So.2d 776, 779 (Ala.Crim.App.1998), cert. denied, 723 So.2d 786 (Ala.1998), appeal after remand, 788 So.2d 185 (Ala.Crim.App.2000), cert. denied, 532 U.S. 1040, 121 S.Ct. 2005, 149 L.Ed.2d 1007 (2001).
"The Confrontation Clause, found in the Sixth Amendment to the United States Constitution, provides: `In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.' The United States Supreme Court `has emphasized that the Confrontation Clause reflects a preference for face-to-face confrontation at trial and that "a primary interest secured by [the provision] is the right of cross-examination."' Ohio v. Roberts, 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980), quoting Douglas v. Alabama, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965) (footnote omitted). This Court has previously held that `evidence which would normally be admissible under an exception to the hearsay rule may still be inadmissible because it violates the confrontation clause of the Sixth Amendment.' Grantham v. State, 580 So.2d 53, 55 (Ala.Crim.App.1991).
"`"In Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court `announced that confrontation clause analysis should proceed case-by-case under a two-track approach that tests the necessity and reliability of the contested testimony.' United States v. Perez, 658 F.2d 654 at 660 (9th Cir.1981) (citing Roberts, 448 U.S. at 65-66, 100 S.Ct. at 2538-2539). The first consideration is the `rule of necessity' established by the sixth amendment. Roberts, 448 U.S. at 65, 100 S.Ct. at 2538. `In the usual case ... the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.' Id. This necessity requirement is not `absolute.' Perez, 658 F.2d at 661. The government is not required to produce a seemingly available witness when the `utility of trial confrontation [is] remote.' Roberts, 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7. Furthermore, `testimony that is neither "crucial" to the prosecution nor "devastating" to the defendant might not be subject to the necessity requirement.' Perez, 658 F.2d at 661 (citing Dutton v. Evans, 400 U.S. 74 at 87, 89, 91 S.Ct. 210 at 219, 220, 27 L.Ed.2d 213 (1970)). If the government establishes the unavailability *969 of the witness, Roberts then requires that the declarant's statement bear adequate `indicia of reliability.' Roberts, 448 U.S. at 66, 100 S.Ct. at 2539."'
"Grantham, 580 So.2d at 55-56 (quoting United States v. McClintock, 748 F.2d 1278, 1291-92 (9th Cir.1984), cert. denied, 474 U.S. 822, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985))."
Barnes v. State, 704 So.2d 487, 494-95 (Ala.Crim.App.1997). "Reliability can be inferred in a case where the evidence falls within a firmly rooted hearsay exception." James v. State, 723 So.2d at 779, citing Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990).
As McNabb correctly points out in his brief to this Court, the State presented no testimony or any other evidence indicating who the "declarants" were as to any of the documents; therefore, the State could not show that the declarants were unavailable to testify and could not satisfy the "necessity" prong of the Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), test. However, in this case, the State was not required to show the unavailability of the declarants under Roberts because the documents were neither "crucial" to the State's case nor "devastating" to McNabb's defense. "Peripheral matters are not significant enough to raise confrontational concerns." Withee v. State, 728 So.2d 684, 687 (Ala.Crim.App.1998). A review of the record in this case reveals that the documents, showing that McNabb had had contact with Officer Gordon before the murder, were peripheral. Although the documents were arguably relevant to an important issue in the case  McNabb's intent  we cannot say, considering all of the evidence in the case, that they were "crucial" to the State's case or "devastating" to McNabb's defense. McNabb's main defense was that he had ingested so much cocaine on the morning of the crimes that he was incapable of forming the intent to kill. Whether or not McNabb knew Officer Gordon would not have affected McNabb's mental capabilities if, in fact, he had ingested so much cocaine that he was unable to form the intent to kill. At most, the documents suggested to the jury that McNabb had a motive for killing Officer Gordon and only in that manner did they peripherally touch on McNabb's intent. Considering McNabb's own testimony that the cocaine did not affect him, and the marginal relevance of the documents, we do not believe that the documents were a significant factor in the jury's rejection of McNabb's defense.
As to the "reliability" prong of the Roberts test, both the booking report from the Montgomery County detention facility and the log from the Montgomery Police Department were properly admitted under firmly rooted hearsay exceptions and, therefore, were inherently reliable. Although McNabb does not specifically argue that the documents were not admissible under any exception to the hearsay rule (he, in fact, conceded as much during trial), we nevertheless note that the booking report was properly admitted into evidence under the "business records" exception to the hearsay rule. Rule 803(6), Ala.R.Evid., providing for the admission of business records, defines "Records of Regularly Conducted Activity" as follows:
"A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, *970 all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term `business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."
See also James v. State, supra at 779 (noting that the rationale behind the "business records" exception to the hearsay rule "is that business records have the `earmark of reliability' or `probability of trustworthiness,' because they reflect the day-to-day operations of the enterprise and are relied upon in the conduct of business"). In this case, the copy of the booking report was certified by the custodian of inmate records at the detention facility. The certification indicated that the copy of the report introduced into evidence was a true and correct copy of the original report kept at the facility; that the report was kept in the course of the facility's regular course of business; that the facility maintained reports for each inmate, including one for McNabb; that the report was created on or near the date indicated on the document; and that the information in the report was completed by a person with knowledge of the acts and events referred to in the report. The report was clearly a "business record" properly admitted under Rule 803(6), Ala.R.Evid.
Likewise, the log from the Montgomery Police Department was properly admitted under the "public records" exception to the hearsay rule. Rule 803(8), Ala.R.Evid., defines "Public Records and Reports" as follows:
"Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, when offered against the defendant in criminal cases, matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the state or governmental authority in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness."
The copy of the log in this case, a computerized printout of the records of the Montgomery Police Department, was certified by the custodian of records as a true and correct copy of the records kept at the Montgomery Police Department. The log was a record setting forth the activities of the Montgomery Police Department, including the activities of Officer Gordon on February 5, 1997, and was properly admitted as a "public record" under Rule 803(8)(A), Ala.R.Evid.
Because the State was not required to show the unavailability of the declarants and because both the booking report from the Montgomery County detention facility and the log from the Montgomery Police Department fell within firmly rooted hearsay exceptions and, therefore, had an indicia of reliability, the admission of the booking report and the log did not violate McNabb's confrontation rights.
In addition, contrary to McNabb's contention, both documents were properly authenticated. "The requirement of an authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 901(a), Ala.R.Evid. "Extrinsic evidence of authenticity as a condition precedent to *971 admissibility is not required with respect to ... [c]ertified copies of public records." Rule 902(4), Ala.R.Evid. In other words, certified copies of public records are self-authenticating. See, e.g., Snavely v. City of Huntsville, 785 So.2d 1162 (Ala.Crim.App.2000); and Wright v. State, 709 So.2d 1318 (Ala.Crim.App.1997). The log from the Montgomery Police Department was properly certified by the custodian of records for the department as a true and correct copy of the record maintained by the department; therefore, it was self-authenticating. The booking report from the Montgomery County detention facility was likewise certified by the custodian of records at the facility. As noted above, that certification included a statement that the copy of the report introduced into evidence was a true and correct copy of the original report kept at the facility; that the report was kept in the course of the facility's regular course of business; that the facility maintained reports for each inmate, including one for McNabb; that the report was created on or near the date indicated on the document; and that the information in the report was completed by a person with knowledge of the acts and events referred to in the report. Therefore, the booking report was properly authenticated. See, e.g., C. Gamble, McElroy's Alabama Evidence, § 254.01(3) (5th ed.1996); Arthur v. State, 711 So.2d 1031 (Ala.Crim.App.1996), aff'd, 711 So.2d 1097 (Ala.1998); and Tomlin v. State, 601 So.2d 130 (Ala.Crim.App.1991).
As to the arrest warrant and its accompanying affidavit, we conclude that the State did not lay the proper foundation for their admission. The warrant was neither certified nor authenticated, and there is no evidence in the record indicating even where the warrant came from, i.e., whether it came from a court file, from the district attorney's records, or from another agency or business. Therefore, we cannot say that the warrant was properly admitted under either the "business records" exception to the hearsay rule or the "public records" exception to the hearsay rule. However, "`testimony that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred.'" Jackson v. State, 791 So.2d 979, 1013 (Ala.Crim.App.), cert. denied, 791 So.2d 1043 (Ala.2000), cert. denied, 532 U.S. 934, 121 S.Ct. 1387, 149 L.Ed.2d 311 (2001), quoting White v. State, 650 So.2d 538, 541 (Ala.Crim.App.1994), overruled on other grounds, Ex parte Rivers, 669 So.2d 239 (Ala.Crim.App.1995). See also Dawson v. State, 675 So.2d 897, 900 (Ala.Crim.App.1995), aff'd, 675 So.2d 905 (Ala.1996) ("The erroneous admission of evidence that is merely cumulative is harmless error."); and Thompson v. State, 527 So.2d 777, 780 (Ala.Crim.App.1988) ("Testimony which may be apparently illegal upon admission may be rendered prejudicially innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred."). Both the log from the Montgomery Police Department and the booking report from the Montgomery County detention facility, like the arrest warrant, showed that McNabb and Officer Gordon had had contact before the crimes. Both the log and the booking report were properly admitted into evidence. Therefore, because there was already legal evidence before the jury indicating that McNabb knew Officer Gordon, any error in the admission of the arrest warrant and its accompanying affidavit was clearly harmless.

IV.
McNabb contends that the trial court erred in allowing a "mug shot" of him to be introduced into evidence. (Issue IV in *972 McNabb's brief.) He argues that the admission of the mug shot automatically requires a reversal because, he says, the photograph suggested to the jury that he had a prior criminal history.
The record reflects that McNabb filed a pretrial motion in limine to prohibit the State from introducing the mug shot into evidence. However, there is no indication in the record that that motion was ever discussed or that the trial court ever ruled on the motion. But, even assuming that the trial court did deny McNabb's motion in limine, it is well settled that an adverse ruling on a motion in limine does not preserve the issue for appellate review unless an objection is made at the time the evidence is introduced. See, e.g., Grimsley v. State, 678 So.2d 1197 (Ala.Crim.App.1996); and Miles v. State, 650 So.2d 583 (Ala.Crim.App.1994). McNabb did not object when the mug shot was introduced into evidence; therefore, we review this issue for plain error. See Rule 45A, Ala.R.App.P.
The photograph of McNabb was the traditional mug-shot photograph consisting of juxtaposed frontal and profile poses. McNabb's name and a nine-digit number were printed directly under the photograph. The State introduced the photograph into evidence during the testimony of Officer William Perkins, at the same time it introduced two other photographs of McNabb, both of which showed McNabb lying face down in the ditch after he had been shot.
In Ex parte Long, 600 So.2d 982 (Ala.1992), overruled on other grounds, Ex parte Edwards, 816 So.2d 98 (Ala.2001), the Alabama Supreme Court stated the following regarding the admissibility of mug shots:
"Mug shots are generally inadmissible in a criminal trial because the jury may infer from them that the defendant has a criminal history. Gross v. State, 395 So.2d 485 (Ala.Crim.App.1981). However, under certain circumstances, admitting a mug shot into evidence does not constitute reversible error.
"We find no cases from this Court directly on the point of the admissibility of mug shots, but the Court of Criminal Appeals has, in numerous cases, relied on the three prerequisites established in United States v. Harrington, 490 F.2d 487 (2d Cir.1973), for a ruling that the introduction of a `mug shot' photograph does not result in reversible error. See, e.g., Williams v. State, 546 So.2d 705 (Ala.Crim.App.1989); Jones v. State, 451 So.2d 389 (Ala.Crim.App.1984); Gross v. State, supra; Williamson v. State, 384 So.2d 1224 (Ala.Crim.App.1980); Holsclaw v. State, 364 So.2d 378 (Ala.Crim.App.1978); but see Brown v. State, 229 Ala. 58, 155 So. 358 (1934) (fact that defendant was in jail when photograph was taken did not present reversible error as to admission of the photograph). The three requirements set out in Harrington are:
"1. The Government must have a demonstrable need to introduce the photographs; and
"2. The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and
"3. The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs.'
"Harrington, 490 F.2d at 494. We conclude that these three inquiries are appropriate criteria to consider when determining the admissibility of a mug shot; however, the failure to meet one or more of these criteria would not necessarily *973 result in reversible error. We shall still apply Rule 45, Ala.R.App.P., when deciding whether to reverse or set aside a judgment for error."
600 So.2d at 989. (Emphasis added.)
In this case, two of the three prongs of the Harrington test were satisfied. The identity of the shooter was not an issue in this case  McNabb admitted that he had killed Officer Gordon and had shot at Officer Perkins and Sanford Sharpe  and, therefore, the State did not have a demonstrable need to introduce the mug shot. However, the photograph itself did not imply that McNabb had a prior criminal record and the manner in which the photograph was introduced did not draw attention to its source or implications. Although the photograph was the traditional mug-shot photograph, with juxtaposed frontal and profile views, which, the Alabama Supreme Court has noted, generally "`produces a "natural, perhaps automatic" inference of prior encounters with the police," Long, 600 So.2d at 991, quoting United States v. Harrington, 490 F.2d 487, 495 (2d Cir.1973), the photograph contained no markings indicating when it was taken, i.e., there was no date on the photograph. Therefore, there was nothing from which the jury could have inferred that McNabb had a prior criminal record. Moreover, the manner in which the photograph was introduced, with two other photographs of McNabb taken on the day of the crimes, did not draw attention to its source or implications, and, also, tended to rebut any inference the jury may have gleaned from the photograph that McNabb had a prior criminal history. The lack of a date on the photograph coupled with the manner in which the photograph was introduced suggested that it was taken when McNabb was arrested for the present crimes and it did not imply that McNabb had a prior criminal record. Therefore, we find no error, plain or otherwise, in the admission of the mug shot.
Moreover, even assuming, for the sake of argument, that the admission of the mug shot was error, it was, at most, harmless error. There was ample evidence before the jury that McNabb had a prior criminal history  including McNabb's own testimony regarding his numerous prior encounters with law enforcement. Therefore, the admission of the mug shot, even if error, was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

V.
McNabb contends that the trial court erred in refusing his requested jury instruction on reckless endangerment as a lesser offense included within the offense of attempted murder. (Issue V in McNabb's brief.) Specifically, McNabb argues that reckless endangerment was a lesser-included offense of attempted murder in his case because, he says, his cocaine intoxication at the time of the crimes negated the specific intent to kill required for attempted murder. Although McNabb did not object to the trial court's refusal to give his requested charge on reckless endangerment at the conclusion of the court's oral charge, he did object during the charge conference; therefore, he properly preserved this issue for review. See, e.g. Molton v. State, 651 So.2d 663, 666 (Ala.Crim.App.1994) ("Where... a defendant clearly objects at the charge conference to the trial court's refusal to give a written requested charge and states specific reasons for that objection, he is not required to renew his objection at the close of the oral instructions to preserve that issue for appellate review.").
"A person accused of the greater offense has a right to have the *974 court charge on lesser included offenses when there is a reasonable theory from the evidence supporting those lesser included offenses." MacEwan v. State, 701 So.2d 66, 69 (Ala.Crim.App.1997). "[E]very accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however, weak, insufficient, or doubtful in credibility." Chavers v. State, 361 So.2d 1106, 1107 (Ala.1978). An accused has the right to have the jury charged on "any material hypothesis which the evidence in his favor tends to establish." Ex parte Stork, 475 So.2d 623, 625 (Ala.1985). "`A court may properly refuse to charge on a lesser included offense only when (1) it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or (2) the requested charge would have a tendency to mislead or confuse the jury.'" Williams v. State, 675 So.2d 537, 540-41 (Ala.Crim.App.1996), quoting Anderson v. State, 507 So.2d 580, 582-83 (Ala.Crim.App.1987).
"`Whether a crime constitutes a lesser-included offense is to be determined on a case-by-case basis.' Aucoin v. State, 548 So.2d 1053, 1057 (Ala.Crim.App.1989). `In determining whether one offense is a lesser included offense of the charged offense, the potential relationship of the two offenses must be considered not only in the abstract terms of the defining statutes but must also ... in light of the particular facts of each case.' Ingram v. State, 570 So.2d 835, 837 (Ala.Crim.App.1990) (citing Ex parte Jordan, 486 So.2d 485, 488 (Ala.1986); emphasis in original). See also Farmer v. State, 565 So.2d 1238 (Ala.Crim.App.1990)."
Ford v. State, 612 So.2d 1317, 1318 (Ala.Crim.App.1992). Section 13A-1-9, Ala.Code 1975, provides, in part:
"(a) A defendant may be convicted of an offense included in an offense charged. An offense is an included one if:
"(1) It is established by proof of the same or fewer than all the facts required to establish the commission of the offense charged; or
"(2) It consists of an attempt or solicitation to commit the offense charged or to commit a lesser included offense; or
"(3) It is specifically designated by statute as a lesser degree of the offense charged; or
"(4) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property or public interests, or a lesser kind of culpability suffices to establish its commission."
"`"In Alabama a person commits the crime of attempt to murder if he intends to cause the death of another person and does any overt act towards the commission of that intent."'" Wells v. State, 768 So.2d 412, 415 (Ala.Crim.App.1999), quoting Minshew v. State, 594 So.2d 703, 704 (Ala.Crim.App.1991), quoting, in turn, Chaney v. State, 417 So.2d 625, 626-27 (Ala.Crim.App.1982). See § 13A-6-2(a), Ala.Code 1975 ("[a] person commits the crime of murder if ... [w]ith intent to cause the death of another person, he causes the death of that person or of another person"); and § 13A-4-2(a), Ala.Code 1975 ("A person is guilty of an attempt to commit a crime if, with the intent to commit a specific offense, he does any overt act towards the commission of such offense."). "A person commits the crime of reckless endangerment if he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person." § 13A-6-24(a), Ala.Code *975 1975. The Commentary to § 13A-6-24, Ala.Code 1975, states: "Reckless endangerment is a new crime and is applicable to reckless conduct which creates a substantial risk of, but does not result in, serious physical injury.... It does not require any particular person to be actually placed in danger, but deals with potential risks, as well as cases where a specific person actually is within the area of danger." In Minshew v. State, 594 So.2d 703 (Ala.Crim.App.1991), this Court recognized that "[t]he offense of reckless endangerment embraces such conduct as ... `reckless driving [,] ... dangerous conduct with firearms [,] ... throwing objects at common carriers, dropping objects from toll bridges, placing equipment within six feet of a high voltage wire, shooting at an unoccupied building, shooting at an aircraft, placing an obstruction on railway tracks, tampering with a railroad safety appliance, and throwing substances likely to injur[e] persons on public highways.'" 594 So.2d at 713, quoting A.L.I. Model Penal Code § 211.12 (1980) (footnotes omitted; emphasis added).
Reckless endangerment may be a lesser-included offense of attempted murder under certain circumstances, because reckless endangerment requires a "lesser kind of culpability" than does attempted murder, i.e., reckless conduct rather than intentional conduct. See Stennet v. State, 564 So.2d 95 (Ala.Crim.App.1990) (holding that reckless endangerment was a lesser-included offense of attempted murder where the defendant shot a gun into an occupied trailer); and Turner v. State, 542 So.2d 1314 (Ala.Crim.App.1989) (holding that reckless endangerment was a lesser-included offense of attempted murder where the defendant drove his car into a police car at high rate of speed). Cf. Hale v. State, 654 So.2d 83 (Ala.Crim.App.1994) (holding that defendant's actions of shooting a rifle in the direction of an occupied building was sufficient to sustain his conviction for reckless endangerment); M.S. v. State, 625 So.2d 1187 (Ala.Crim.App.1993) (holding that defendant's actions of shooting a BB gun directly at another person was sufficient to sustain his delinquency adjudication for the underlying offense of reckless endangerment); and Farmer v. State, 565 So.2d 1238 (Ala.Crim.App.1990) (holding that reckless endangerment was a lesser-included offense of discharging a firearm into an occupied dwelling). But see Commentary to § 13A-6-24, Ala.Code 1975 ("[r]eckless endangerment ... is applicable to reckless conduct which creates a substantial risk of, but does not result in, serious physical injury"); Campbell v. State, 654 So.2d 69 (Ala.Crim.App.1994) (holding that reckless endangerment was not a lesser-included offense of attempted murder where the victim was actually injured); Nelson v. State, 595 So.2d 506 (Ala.Crim.App.1991), rev'd on other grounds, 595 So.2d 510 (Ala.1991), on remand to, 595 So.2d 513 (Ala.Crim.App.1992) (same); and Minshew v. State, supra (holding that reckless endangerment was not a lesser-included offense of attempted murder where the evidence showed, at most, that the defendant was guilty of "attempted reckless endangerment" which is "legally impossible" because reckless endangerment requires recklessness while attempt requires a specific intent).
In this case, McNabb admitted shooting and killing Officer Gordon and shooting at Sanford Sharpe and Officer Perkins. The only real issue at trial was McNabb's intent when he committed the crimes. McNabb asserted that he did not have the intent to kill when he committed the crimes because, he argued, he had ingested such a large quantity of cocaine before the crimes that he was incapable of forming the intent to kill. He presented evidence to support this defense, including *976 expert testimony on the physical and psychological effects of habitual cocaine use. The trial court instructed the jury on voluntary intoxication and, as to the capital murder charge, on the lesser-included offense of reckless manslaughter. Clearly, the trial court recognized that there was at least some evidence, however weak and doubtful in credibility, from which the jury could have concluded that, because of his cocaine intoxication, McNabb did not have the intent to kill when he shot and killed Officer Gordon.
"[I]ntoxication, whether voluntary or involuntary, is admissible in evidence whenever it is relevant to negate an element of the offense charged." § 13A-3-2(a), Ala.Code 1975. "'"Voluntary drunkenness does not excuse crime, yet its excessiveness may produce such a mental condition as to render the intoxicated person incapable of forming a specific intent."'" Jackson v. State, 791 So.2d 979, 1019 (Ala.Crim.App.), cert. denied, 791 So.2d 1043 (Ala.2000), cert. denied, 532 U.S. 934, 121 S.Ct. 1387, 149 L.Ed.2d 311 (2001), quoting Lovett v. State, 491 So.2d 1034, 1039 (Ala.Crim.App.), cert. denied, 491 So.2d 1039 (Ala.1986), quoting, in turn, State v. Massey, 20 Ala.App. 56, 58, 100 So. 625, 627 (1924). "While voluntary intoxication is not a defense to a criminal charge, it can negate the specific intent necessary for an intentional murder, reducing the offense to manslaughter." Ex parte McWhorter, 781 So.2d 330, 341 (Ala.2000), cert. denied, 532 U.S. 976, 121 S.Ct. 1612, 149 L.Ed.2d 476 (2001). See also Whitehead v. State, 777 So.2d 781 (Ala.Crim.App.1999), aff'd 777 So.2d 854 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001); Smith v. State, 756 So.2d 892 (Ala.Crim.App.1998), aff'd, 756 So.2d 957 (Ala.), cert. denied, 531 U.S. 830, 121 S.Ct. 82, 148 L.Ed.2d 44 (2000); and McConnico v. State, 551 So.2d 424 (Ala.Crim.App.1988). The question whether a defendant's intoxication rendered it impossible for him to form a particular mental state is a question for the jury. See, e.g., Williams v. State, 710 So.2d 1276 (Ala.Crim.App.1996), cert. denied, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); and Owen v. State, 611 So.2d 1126 (Ala.Crim.App.1992). Attempted murder, like intentional murder, requires a specific intent. If voluntary intoxication may negate the specific intent necessary for intentional murder by diminishing an accused's culpable mental state to that of recklessness and thereby reducing the offense to reckless manslaughter, it may likewise negate the specific intent necessary for attempted murder and diminish an accused's culpable mental state to recklessness, thereby reducing the offense from attempted murder to reckless endangerment. The same evidence of intoxication that supported the trial court's instructions on intoxication and reckless manslaughter as a lesser-included offense of capital murder also supported an instruction on reckless endangerment as a lesser-included offense of attempted murder. Under the facts of this case, reckless endangerment is a lesser-included offense of attempted murder, and the trial court erred in denying McNabb's request to so charge the jury.
However, our conclusion that the trial court erred in refusing to instruct the jury on reckless endangerment as a lesser-included offense of attempted murder does not end our analysis. "After finding error, an appellate court may still affirm a conviction on the ground that the error was harmless, if indeed it was." Guthrie v. State, 616 So.2d 914, 931 (Ala.Crim.App.1993), citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). "The harmless error *977 rule applies in capital cases." Knotts v. State, 686 So.2d 431, 469 (Ala.Crim.App.1995), opinion after remand, 686 So.2d 484 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997), citing Ex parte Whisenhant, 482 So.2d 1241 (Ala.1983). "In order for a constitutional error to be deemed harmless under Chapman, the state must prove beyond a reasonable doubt that the error did not contribute to the verdict. In order for the error to be deemed harmless under Rule 45, the state must establish that the error did not injuriously affect the appellant's substantial rights." Coral v. State, 628 So.2d 954, 973 (Ala.Crim.App.1992), opinion after remand, 628 So.2d 988 (Ala.Crim.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). "The purpose of the harmless error rule is to avoid setting aside a conviction or sentence for small errors or defects that have little, if any, likelihood of changing the result of the trial or sentencing." Davis v. State, 718 So.2d 1148, 1164 (Ala.Crim.App.1997), aff'd, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999). The failure to charge on a lesser-included offense may, in some circumstances, be harmless error. See, e.g., Baker v. State, [Ms. CR-95-0292, January 12, 2001] ___ So.2d ---- (Ala.Crim.App.2001) (the trial court's failure to charge the jury on reckless murder and felony murder was, at most, harmless error, where the jury was charged on capital murder, intentional murder, reckless manslaughter and heat-of-passion manslaughter and the jury found the defendant guilty of capital murder); Smith v. State, supra (the trial court's failure to charge the jury on reckless manslaughter was not error but, even if it was, it was harmless error, where the jury was charged on capital murder, intentional murder, and robbery and the jury found the defendant guilty of capital murder); Moore v. State, 647 So.2d 43 (Ala.Crim.App.1994) (the trial court's failure to charge the jury on menacing as a lesser-included offense of discharging a firearm into an occupied dwelling was, at most, harmless error, where the jury was charged on the charged offense and the lesser-included offense of reckless endangerment and the jury found the defendant guilty of the greater offense); and Brown v. State, 623 So.2d 416 (Ala.Crim.App.1993) (the trial court's failure to charge the jury on lesser-included offenses was, at most, harmless error, where the jury was charged on capital murder and felony murder and the jury found the defendant guilty of capital murder).
As noted above, the trial court in this case instructed the jury on intoxication and on reckless manslaughter as a lesser-included offense of capital murder. The jury found McNabb guilty of capital murder. The crimes in this case  the attempted murder of Sharpe, the murder of Officer Gordon, and the attempted murder of Officer Perkins  happened within a span of minutes. By finding McNabb guilty of capital murder with respect to the murder of Officer Gordon, the jury rejected McNabb's claim that he was so intoxicated that he was unable to form the intent to kill. Given the time frame of the crimes, it is inconceivable that the jury could have found that McNabb had the intent to kill when he shot and killed Officer Gordon, but did not have the intent to kill (because of intoxication) when he shot at Sharpe and Officer Perkins, only minutes before and after the murder of Officer Gordon. By virtue of the jury's verdict of capital murder and its express rejection of McNabb's defense of intoxication, we conclude that an instruction on reckless endangerment as a lesser-included offense of attempted murder, although proper, *978 "would not have affected the outcome of this case," and, therefore, that any error on the part of the trial court in refusing to charge the jury on reckless endangerment was harmless beyond a reasonable doubt. Ex parte Jordan, 486 So.2d 485, 489 (Ala.1986).

VI.
McNabb contends that the trial court erred in instructing the jury that the intent to kill could be inferred from the use of a deadly weapon. (Issue VIII in McNabb's brief.) Specifically, during its oral charge, the trial court instructed the jury that "the intent to kill may be inferred from the use of a deadly weapon and the character of the assault." (R. 2542.) McNabb maintains that this instruction improperly invaded the province of the jury and deprived him of the right to have the jury make the finding of his intent beyond a reasonable doubt. Because McNabb did not object to the court's instruction in this regard, we may review this claim only for plain error. See Rule 45A, Ala.R.App.P.
In Hart v. State, 612 So.2d 520 (Ala.Crim.App.1992), aff'd, 612 So.2d 536 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993), this Court upheld a virtually identical instruction. In so doing, we stated:
"The appellant also argues that the trial court's instructions to the jury concerning the element of intent were flawed. Specifically, he alleges that the court instructed the jury that they could infer the element of intent from the appellant's use of a pistol during the robbery, and in doing so, shifted the burden of proof of intent to him. The trial court instructed the jury that `malice and intent may be inferred from the use of a pistol.' This instruction is presently consistent with Alabama law. See DeRamus v. State, 565 So.2d 1167 (Ala.Crim.App.1990); Garrison v. State, 521 So.2d 997 (Ala.Crim.App.1986). Nevertheless, the appellant maintains that such instructions violate the United States Supreme Court's holding in Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), because they shift the burden of proof of intent from the State to the defendant.
"In Sandstrom, the Supreme Court held that instructions which a reasonable jury could interpret as an `irrebuttable direction by the court to find intent' violate a defendant's due process rights. Sandstrom, 442 U.S. at 517, 99 S.Ct. 2450. The complained-of instruction in Sandstrom was as follows: `[T]he law presumes that a person intends the ordinary consequences of his voluntary acts.' The instruction in Sandstrom created a `mandatory presumption.'
"In DeRamus v. State, 565 So.2d 1167 (Ala.Crim.App.1990), the trial court gave a similar instruction to the jury as the one involved in the instant case. The instruction stated,' "[Intent] may be inferred from the character of the assault, the use of a deadly weapon or any other circumstances."' 565 So.2d at 1170. We stated that this instruction created a `permissive inference,' and was not error.
"`"A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts. A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." Francis v. Franklin, 471 U.S. [307] at 314, 105 S.Ct. [1965] at 1971 [85 L.Ed.2d 344 (1985)]. A permissive inference only violates the Due Process Clause "if the suggested conclusion *979 is not one that reason and common sense justify in light of the facts before [the] jury." 471 U.S. at 314, 105 S.Ct. at 1971.'
"565 So.2d at 1170. The cited instruction in the instant case created a permissive inference. `The specific language cited by the appellant could not reasonably have been understood as creating a presumption which relieved the State of its burden of proof on the element of intent.' 565 So.2d at 1170."
612 So.2d at 529. In addition, in Ex parte Burgess, 827 So.2d 193 (Ala.2000), the Alabama Supreme Court stated:
"An instruction that `intent to commit murder may be presumed from the defendant's act of using a deadly weapon,' would unconstitutionally shift to the defendant the burden of proving lack of specific intent. Yates v. Evatt, 500 U.S. 391, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991); and Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). The correct instruction on this particular point would be that intent to kill may be inferred from the defendant's act of using a deadly weapon. Sparks v. State, 261 Ala. 2, 75 So.2d 103 (1953); and Douglas v. State, 42 Ala.App. 314, 328, 163 So.2d 477, 490 (1963), overruled on other grounds, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). Ex parte Bayne, 375 So.2d 1239, 1244 (Ala.1979), is overruled to the extent that it misconstrues Douglas, supra, and allows an instruction that intent may be presumed, as distinguished from inferred, from the use of a deadly weapon."
827 So.2d at 199-200. The court in this case correctly instructed the jury that the intent to kill could be inferred from the use of a deadly weapon; it did not impermissibly charge the jury that the intent to kill should be presumed from the use of a deadly weapon. Therefore, there was no error, much less plain error, in the trial court's instruction on intent.

VII.
McNabb contends that the trial court's supplemental jury instruction on attempted murder was erroneous. (Issue VI in McNabb's brief.) Specifically, McNabb argues that in its supplemental instruction, the trial court failed to specifically charge the jury that the victims of the attempted-murder charges were Sanford Sharpe and Officer Perkins. Because attempted murder is a specific intent crime and because the trial court did not identify the victims of the attempted-murder charges in its supplemental instruction, McNabb concludes, the trial court "improperly expanded the attempted murder charges ... to include not only Sharpe and Perkins but anyone else." (McNabb's brief at p. 73.) This argument is meritless.
During the trial court's initial instructions to the jury, it explained the charges against McNabb as follows:
"We're trying three cases. In case number 97-2541, the defendant is charged with two counts of capital murder. In case number 97-2542, the defendant is charged with attempted murder on Mr. Sharpe. In case number 97-2543, the defendant is charged with attempted murder on Officer Perkins."
(R. 2517.) Subsequently, when defining attempted murder, the trial court instructed the jury, in pertinent part, as follows:
"The defendant is also charged with two cases of attempted murder: One against Mr. Sharpe, and one against Officer Perkins. I will charge you on the law of murder, and then I will charge you on the law of intent. Okay. [Section] 13A-6-2[, Ala.Code 1975,] reads: A person commits the crime of murder if, with the intent to cause the *980 death of another person, he causes the death of that person or another person.... Of course, if a person falls short of committing a murder, if he attempts to commit the murder but does not consummate the murder. The attempt is a lack of consummating the murder. So the charges are one count against Sharpe and one count against Perkins, of attempted murder.

"[Section] 13A-4-2 reads as follows: A person is guilty of an attempt to commit a crime if, with the intent to commit a specific offense, he does any overt act toward the commission of such offense.... [A]ttempt then, which he is charged with attempted murder, he falls short of causing the murder, and therefore it was an attempt. Therefore, section 13A-4-2 reads: `A person is guilty of an attempt to commit a crime, if, with the intent to commit such a specific offense, he does any overt act towards the commission of such offense.' That is the law that applies to the two attempted murder charges."
(R. 2535-37.) (Emphasis added.)
After jury deliberations began, the jury returned and asked to be recharged on attempted murder. The trial court gave the following supplemental instruction:
"The question here is: Please reread the legal definition of attempted murder. I will do that for you. Of course, you are obligated and you should, in your deliberations, remember the complete charge that I gave you yesterday. Do you understand? Now, of course, I will read the definition of attempted murder, and you are not to separate this definition from the overall general charge.
"Section 13A-6-2 reads as follows: A person commits the crime of murder if, with intent to cause the death of another person, he causes the death of that person or of another person. A person commits the crime of murder if, with intent to cause the death of another person, he causes the death of that person or of another person.
"Attempted murder obviously falls short of murder. Section 13A-4-2 is the definition of attempt. It reads: A person is guilty of an attempt to commit a crime if, with the intent to commit a specific crime or offense, he does any overt act toward the commission of such offense. I will read it again. A person is guilty of an attempt to commit a crime if, with the intent to commit a specific offense, he does any overt act toward the commission of such offense.
"As I have told you, it is not my job to amplify or to try to editorialize on these definitions, except, since you asked for the definition, to say, 13A-6-2 defines intentional murder. If someone is not murdered but there is an attempt made by some overt act to commit the murder, then, of course, that is attempted murder. Do you understand?
"I will read the statute section one more time. 13A-6-2. `A person commits the crime of murder if, with intent to cause the death of another person, he causes the death of that person or of another person.' The person has the intent to cause the death of a person and he causes the death of that person or of another person.
"If it falls short of that by some overt act, section 13A-4-2 reads: A person is guilty of an attempt to commit a crime if, with the intent to commit a specific offense, and in this case, murder, he does any overt act toward the commission of said offense."
(R. 2567-70.) McNabb objected to this supplemental instruction on the ground that the court had failed to properly instruct the jury that the attempted-murder *981 charges applied only to Sanford Sharpe and Officer Perkins and not to anyone else.
We find no error in the trial court's supplemental instruction. As shown by the record, the trial court instructed the jury on three separate occasions during its initial instructions that the alleged victims of the attempted-murder charges were Sanford Sharpe and Officer Perkins. Although it did not specifically identify Sharpe and Officer Perkins as the alleged victims of the attempted-murder charges in its supplemental instruction, it did instruct the jury that it should remember the complete charge that had been given earlier. In addition, the evidence presented at trial clearly indicated that the alleged victims were Sharpe and Officer Perkins and no one else. We have no doubt that the jury was keenly aware of who the alleged victims of the attempted-murder charges were. Furthermore, in defining attempted murder during its supplemental instruction, the trial court made it very clear that McNabb had to have the specific intent to commit murder and that the intent required for murder was the intent to cause the death of a specific person. Although in defining murder the trial court instructed the jury that the defendant must not only have the intent to murder a specific person, but that the defendant must also cause the death of the person he intended to murder "or of another person," we do not believe that the phrase "or of another person" confused or misled the jury into believing that McNabb did not have to have the specific intent to kill Sharpe and Officer Perkins in order to be convicted of attempted murder. Therefore, we find no error in the trial court's supplemental instruction on attempted murder.

VIII.
McNabb contends that the trial court erred in allowing television cameras in the courtroom to record the guilt-phase verdicts without the consent of either party. (Issue IX in McNabb's brief.) Specifically, he argues that the presence of cameras in the courtroom "could have easily intimidated a juror who had been bullied or ignored in the jury room from speaking up when the jury was polled." (McNabb's brief at p. 84.) In addition, he argues that "the presence of cameras can exert subtle pressure on even conscientious trial judges by reminding them that the public is watching their every move." (McNabb's brief at p. 84.) McNabb does not allege, however, that the presence of cameras in the courtroom in his case did, in fact, intimidate any of the jurors or exert any type of pressure on the trial judge, or that he was prejudiced in any way. McNabb's only argument is that his convictions should be reversed solely because the presence of cameras in the courtroom created the possibility of prejudice.
Rule 9.4, Ala.R.Crim.P., provides: "The taking of television pictures or other photographs in or of the courtroom during the progress of judicial proceedings or the radio broadcasting of judicial proceedings may be permitted as provided in Canon 3.A.(7) and (7B), Canons of Judicial Ethics, promulgated by the Alabama Supreme Court, or as otherwise may be permitted by law or other rule of court." Canon 3.A.(7), Canons of Judicial Ethics, provides, in pertinent part, that "[a] trial judge or an appellate court should prohibit broadcasting by television or radio, recording or taking of photographs in the courtroom unless the trial judge or appellate court determines that such should be allowed in accordance with the provisions of (7A) or (7B)." Canon 3.A.(7A) requires that before a trial court may allow the broadcasting of by television or radio, or the recording or taking of photographs during, a criminal proceeding, it must obtain *982 the "written consent" of both the accused and the prosecutor.
The record reflects that before trial, both the State and McNabb's counsel objected to the presence of cameras in the courtroom during the trial. The trial court agreed and prohibited any cameras from being in the courtroom during the trial. However, after the jury retired to deliberate, the following occurred:
"The Court: The cameras were not in the courtroom and did not cover the trial, this phase of the trial. I told them the cameras could be in here now. The objection was to the cameras in the courtroom during the trial, and they were not in.
"[McNabb's counsel]: We object.
"[McNabb's cocounsel]: This is still part of the trial.
"[McNabb's counsel]: The district attorney is not here. I would like to address that issue, Your Honor.
"(The district attorney enters the courtroom.)
"The Court: Let me get something straight right now. Sit down, [defense counsel]. Both sides objected to the cameras being in the courtroom during the trial.
"[Prosecutor]: Yes.
"The Court: And the court respected that objection and the cameras were not in the courtroom during the trial. The press has requested to have a still camera in here to take the verdict. The court finds that is acceptable. The public has a right to see what the verdict is. You can address that.
"[McNabb's counsel]: All I want to address is if they lay the cameras down, because unless a verdict is announced  if we know there is a verdict announced, fine, but 
"The Court: Let me run this. Right now he is not taking any pictures.
"[McNabb's counsel]: The jury will have to be told about the pictures.
"The Court: Don't worry about that.
"[McNabb's counsel]: May they just lower them and put them on the floor?
"The Court: Bring the jury out.
"[McNabb's counsel]: We would rather not even have any mention of the cameras being in the courtroom. All right."
(R. 2560-61.) (Emphasis added.) At that point, the jury requested a recess. The court gave the jury a 10-minute recess and then the jury resumed its deliberations. It appears from the record that at some point later that afternoon, the jury submitted a question to the trial court. Because of the late hour, the trial court held the question and recessed the jury overnight. When the jury returned the next morning, the trial court responded to the jury's question. However, before the trial court brought the jury into the courtroom and responded to its question, the trial court specifically instructed the media that cameras would have to be turned off. When the jury returned its verdicts, the media was allowed to film the verdicts; however, the trial court instructed the media to line up in the back of the courtroom and to avoid filming the jury.
From the exchange quoted above, it is clear that any error in the trial court's allowing cameras in the courtroom to record the jury's guilt-phase verdicts was invited error. McNabb's counsel specifically said that he had no objection to the cameras recording the verdicts; he objected only to the cameras recording any matter involving the jury other than its verdicts. It appears from the record that nothing other than the jury's verdicts was, in fact, recorded.
"`"`A party cannot assume inconsistent positions in the trial and appellate *983 courts and, as a general rule, will not be permitted to allege an error in the trial court proceedings which was invited by him or was a natural consequence of his own actions.'"' Slaton v. State, 680 So.2d 879, 900 (Ala.Crim.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), quoting Campbell v. State, 570 So.2d 1276, 1282 (Ala.Crim.App.1990). As we have said in applying the invited-error doctrine, '"It would be a sad commentary upon the vitality of the judicial process if an accused could render it impotent by his own choice."' Murrell v. State, 377 So.2d 1102, 1105 (Ala.Crim.App.), cert. denied, 377 So.2d 1108 (Ala.1979), quoting Aldridge v. State, 278 Ala. 470, 474, 179 So.2d 51, 54 (1965). `The invited error rule has been applied equally in capital cases and noncapital cases.' Rogers v. State, 630 So.2d 78, 84 (Ala.Crim.App.1991), rev'd on other grounds, 630 So.2d 88 (Ala.1992), aff'd on remand, sub nom. Musgrove v. State, 638 So.2d 1347 (Ala.Crim.App.1992), aff'd, 638 So.2d 1360 (Ala.1993), cert. denied, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994).''
Perkins v. State, 808 So.2d 1041 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001). "`An invited error is waived, unless it rises to the level of plain error.'" Williams v. State, 710 So.2d 1276, 1316 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998), quoting Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991). "To rise to the level of plain error, the claimed error must not only seriously affect a defendant's `substantial rights,' but it must also have an unfair prejudicial impact on the jury's deliberations." Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001).
Nothing in the record even remotely suggests that any of McNabb's substantial rights were violated or that the presence of cameras in the courtroom when the jury returned its guilt-phase verdicts had an unfair prejudicial impact on the jury's deliberations. There is no indication that the cameras caused any disruption when the verdicts were returned or when the jury was polled. Moreover, as noted above, McNabb's only allegation of prejudice is based on pure speculation that the presence of the cameras may have intimidated one of the jurors or may have exerted pressure on the trial judge. Under the circumstances of this case, we find no error, much less plain error, in the trial court's allowing cameras in the courtroom to record the return of the guilt-phase verdicts.

IX.
McNabb contends that Alabama's capital sentencing scheme is unconstitutional because, he says, it "does not specify a measure or standard by which aggravating circumstances must outweigh mitigating circumstances in order to warrant recommendation or imposition of a death penalty." (Issue XII in McNabb's brief.) McNabb is presenting this claim for the first time on appeal; therefore, we review it only for plain error. See Rule 45A, Ala.R.App.P.
This issue has been addressed and decided adversely to McNabb on numerous occasions. Specifically, in Reeves v. State, 807 So.2d 18 (Ala.Crim.App.2000), this Court addressed an identical argument and stated:
"The appellant contends that Alabama's capital sentencing scheme is unconstitutional because, he says, it `does not specify a measure or standard by which aggravating circumstances must *984 outweigh mitigating circumstances in order to warrant recommendation or imposition of a death penalty.' (Appellant's brief to this Court, p. 42.) According to the appellant, `the absence of a standard and the trial court's failure to so charge the jury' renders capital sentencing in Alabama unconstitutional. (Appellant's brief to this court, p. 42.) Because the appellant is presenting this claim for the first time on appeal, we review it under the plain-error rule. Rule 45A, Ala.R.App.P.
"In Franklin v. Lynaugh, 487 U.S. 164, 179, 108 S.Ct. 2320, 2330, 101 L.Ed.2d 155 (1988), the United States Supreme Court rejected the notion that `a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required.' `Equally settled is the corollary that the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer.' Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 1035, 130 L.Ed.2d 1004 (1995)."
807 So.2d at 46-47. See also Tyson v. State, 784 So.2d 328 (Ala.Crim.App.), aff'd, 784 So.2d 357 (Ala.2000), cert. denied, 532 U.S. 1040, 121 S.Ct. 2003, 149 L.Ed.2d 1005 (2001). We find no error, plain or otherwise, as to this claim.

X.
McNabb contends that the trial court erred in giving its penalty-phase jury instructions at the beginning of the penalty phase of the trial, before the presentation of evidence and arguments of counsel. (Issue X in McNabb's brief.)
The record reflects that at the beginning of the penalty phase, before opening statements, the trial court gave complete and accurate instructions on sentencing. At the conclusion of the penalty phase, the trial court gave a brief supplemental instruction. The jury then retired for deliberations. The jury deliberated for approximately two and one-half hours before recommending, by a vote of 10-2, that McNabb be sentenced to death. McNabb did not object to the trial court's procedure at any time. Therefore, we review this claim only for plain error. See Rule 45A, Ala.R.App.P.
At the time of McNabb's trial, Rule 21.1, Ala.R.Crim.P., provided, in pertinent part, that "the court shall instruct the jury after the arguments are completed."[3] Section 13A-5-46(d), Ala.Code 1975, dealing with sentencing hearings in capital cases, provides: "After hearing the evidence and the arguments of both parties at the sentence hearing, the jury shall be instructed on its function and on the relevant law by the trial judge." However, in Loggins v. State, 771 So.2d 1070 (Ala.Crim.App.1999), aff'd, 771 So.2d 1093 (Ala.2000), relying on Frazier v. State, 758 So.2d 577 (Ala.Crim.App.), aff'd, 758 So.2d 611 (Ala.1999), cert. denied, 531 U.S. 843, 121 S.Ct. 109, 148 L.Ed.2d 66 (2000), and James v. State, 723 So.2d 776 (Ala.Crim.App.), cert. denied, 723 So.2d 786 (Ala.1998), opinion after remand, 788 So.2d 185 (Ala.Crim.App.2000), cert. denied, 532 U.S. 1040, 121 S.Ct. 2005, 149 L.Ed.2d 1007 (2001), this Court stated:
"Recently, in Frazier v. State, 758 So.2d 577 (Ala.Crim.App.1999), and James v. State, [1998] 723 So.2d 776 (Ala.Crim.App.), cert. denied, 723 So.2d 786 (Ala.1998), this court found no plain error in the penalty phase of capital *985 murder trials where the trial court charged the jury before the presentation of evidence and arguments of counsel. We have reviewed the pertinent facts in the present case and find them to be substantially similar to the circumstances in both Frazier and James. In Frazier and James, as in the present case, the trial court accurately stated the principles of law and the responsibilities of the jury. In none of the three cases did defense counsel object to the trial court's instruction at any time during the penalty phase. Additionally, in the present case, as was the case in Frazier, no significant time intervened between the trial court's instructions to the jury and the jury's deliberations. Moreover, in the present case, there was a recess for lunch between the conclusion of counsel's arguments and the jury's deliberations, allowing jurors an interval `to recover from the purely emotional aspects of the lawyers' argument before beginning deliberations.' See James v. State, 723 So.2d 786, 787 (Ala.1998). Considering the similarity between Frazier, James, and the present case and applying the rationale set forth in Frazier and James, we conclude that the trial court did not commit plain error in this case by instructing the jury during the penalty phase before the arguments of counsel."
771 So.2d at 1089-90.
As noted above, after closing arguments, the trial court gave a supplemental instruction to the jury. This instruction provided a period for the jury "to recover from the purely emotional aspects of the lawyers' argument before beginning deliberations." Moreover, the time between the trial court's instructions to the jury at the beginning of the penalty phase and the jury's deliberations was relatively short  the State presented only two witnesses at the penalty phase and McNabb presented no witnesses. Therefore, as in Loggins, Frazier, and James, we find no plain error in the trial court giving its instructions to the jury at the beginning of the penalty phase, before the presentation of evidence and arguments of counsel.

XI.
McNabb contends that the trial court erred in refusing to specifically instruct the jury that his cocaine impairment at the time of the crimes was a nonstatutory mitigating circumstance. (Issue XI in McNabb's brief.)[4] Specifically, he argues that the trial court's refusal to instruct the jury on his cocaine impairment resulted in the trial court "relegat[ing] non-statutory factors to inferior status." (McNabb's brief at p. 89.) The record reflects that McNabb requested the following instructions:
Instruction No. 22: "If you find that the defendant's judgment was impaired as a result of cocaine intoxication, you must consider that as a mitigating circumstance.
Instruction No. 23: "If you find that the defendant was acting in an agitated state of panic fueled by cocaine intoxication you must consider that as a mitigating circumstance."
(C. 476-77.)
McNabb argued at trial, and argues on appeal, that his cocaine intoxication was a nonstatutory mitigating circumstance *986  separate and distinct from the statutory mitigating circumstance that McNabb lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the law, see § 13A-5-51(6), Ala.Code 1975  and that, therefore, the jury should have been specifically instructed to consider it as a nonstatutory mitigating circumstance. However, "'"[t]his Court has held that the trial court does not have to instruct the jury from a list of specific nonstatutory mitigating circumstances provided by the defendant."'" Smith v. State, [Ms. CR-97-1258, December 22, 2000] ___ So.2d ___, ---- (Ala.Crim.App.2000), quoting Hagood v. State, 777 So.2d 162, 198 (Ala.Crim.App.1998), aff'd in pertinent part, rev'd on other grounds, 777 So.2d 214 (Ala.2000), on remand to, 777 So.2d 221 (Ala.Crim.App.2000), opinion after remand, 777 So.2d at 223 (Ala.Crim.App.2000), quoting, in turn, Brown v. State, 686 So.2d 385, 403 (Ala.Crim.App.1995), aff'd, 686 So.2d 409 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997).
In this case, the trial court properly instructed the jury on the statutory and nonstatutory mitigating circumstances as follows:
"The law of this State provides a list of some of the mitigating circumstances upon which you may consider, but that list is not a complete list of the mitigating circumstances you may consider. I will now read to you a list of some of the mitigating circumstances that you may consider. These include: The defendant has no significant history of prior criminal activity. The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance. The victim was a participant in the defendant's conduct or consented to the act. The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor. The defendant acted under extreme duress or under the substantial domination of another person. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. A person's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law is not the same as his ability to know right from wrong, generally, or to know what he is doing at a given time, or to know what he's doing is wrong. A person may indeed know that doing the act that constitutes a capital offense is wrong and still not appreciate [its] wrongfulness because he does not fully comprehend or is not fully sensitive to what he is doing or how wrong it is. Further, for this mitigating circumstance to exist, the defendant's capacity to appreciate does not have to have been totally obliterated. It is enough that it was substantially lessened or substantially diminished. Finally, this mitigating circumstance would exist even if the defendant did appreciate the criminality of his conduct, if his capacity to conform to the law was substantially impaired, since a person may appreciate that his actions are wrong and still lack the capacity to refrain from doing them.
"Seven. The age of the defendant at the time of the crime. A mitigating circumstance does not have to be included in the list I have read to you in order for it to be considered by you. In addition to the mitigating circumstances previously specified, mitigating circumstances shall include any aspect of a defendant's character, or record, and any other circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death. A mitigating *987 circumstance considered by you should be based on the evidence you have heard. When the existence of an offered mitigating circumstance is in dispute, the State shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence."
(R. 2602-06.) (Emphasis added.) There was no error in the trial court's refusal to give McNabb's two requested jury instructions on cocaine intoxication.

XII.
McNabb contends that the prosecutor engaged in misconduct during the penalty phase of his trial when, he says, the prosecutor improperly told the jury during opening statements that two aggravating circumstances  that the offense was committed for the purpose of avoiding or preventing a lawful arrest, see § 13A-5-49(5), Ala.Code 1975, and that the offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of the laws, see § 13A-5-49(7), Ala.Code 1975  had been proven beyond a reasonable doubt by the guilt-phase verdicts. (Issue VII in McNabb's brief.) Specifically, McNabb argues that the prosecutor improperly suggested to the jury that the State "had no burden to shoulder on the first two aggravating circumstances," and that, therefore, he was deprived of his right to have the State prove the aggravating circumstances beyond a reasonable doubt.
"`This court has stated that "[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract." Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). See also Henderson v. State, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). "In judging a prosecutor's closing argument, the standard is whether the argument `so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Bankhead, 585 So.2d at 107, quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). "A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury." Roberts v. State, [735 So.2d 1244 (Ala.Crim.App.1997)], aff'd, [735 So.2d 1270 (Ala.), cert. denied, 538 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999)]. Moreover, "statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict." Bankhead, 585 So.2d at 106. "Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim.App.1978), and that court is given broad discretion in determining what is permissible argument." Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id.'"
Taylor v. State, 808 So.2d 1148, 1185-86 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001), quoting Freeman v. State, 776 *988 So.2d 160, 184 (Ala.Crim.App.1999), aff'd, 776 So.2d 203 (Ala.2000), cert. denied, 531 U.S. 966, 121 S.Ct. 400, 148 L.Ed.2d 308 (2000). See also Reeves v. State, 807 So.2d 18, 47 (Ala.Crim.App.2000).
In context, the prosecutor stated the following during opening statements:
"The aggravating circumstances are, as the Judge has read them to you: That the capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or enforcement of laws. That's the first one. Now, what that aggravating circumstance is is that what this defendant did back on September 24, 1997, when he took his Luger 9mm pistol and held it behind his back, after he had collided with Annie Gamble, after he had shot at Sanford Sharpe, knowing that he was wanted, when he took that pistol and took each step as he walked towards Anderson Gordon with that pistol hidden, and then positioned himself behind Anderson Gordon so that he could ambush him. He did that to keep Anderson Gordon from finding out what happened, to keep him from investigating the wreck, which in turn, he would have found out that this defendant had shot at Sanford Sharpe, and most importantly, it kept Anderson Gordon from calling in on the radio, as soon as Anderson Gordon recognized him from having previously dealt with him, knowing that it was Torrey McNabb and that he was wanted and due back in jail. That's the first aggravating circumstance. The second aggravating circumstance is that this defendant did kill him to prevent his lawful arrest, because as soon as Anderson Gordon, if the defendant had given him the opportunity to investigate, he would have promptly arrested this defendant. That's the second aggravating circumstance.
"Your verdict in this case, I will submit to you and I will argue to you, that you have found those two aggravating circumstances beyond a reasonable doubt, because by your verdict, you have found this defendant guilty of the capital offense of the murder of a peace officer while in performance of his duty."
(R. 2616-18) (Emphasis added). McNabb objected to this statement by the prosecutor; the trial court overruled the objection.
McNabb's interpretation of the prosecutor's comments is strained. Contrary to McNabb's contention, the prosecutor did not tell the jury that it had no option but to find the existence of the two aggravating circumstances based on its guilt-phase verdicts. The prosecutor prefaced his argument by stating, "I will submit to you and I will argue to you." (R. 2618.) Viewing the complained-of comment, both in the context of the prosecutor's entire opening statement and in the context of the entire trial, it is clear that the prosecutor was arguing that the evidence presented by the State during the guilt phase, which supported the guilt-phase verdicts, established the two aggravating circumstances. This was not improper." `[T]he prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.'" Reeves v. State, 807 So.2d 18, 45 (Ala.Crim.App.2000), quoting Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Crim.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). The prosecutor never stated, suggested, or implied that it did not have the burden of proving the aggravating circumstances beyond a reasonable doubt. Moreover, the trial court thoroughly instructed the jury, on several occasions throughout the trial, that opening and closing statements of counsel were not evidence and that the State had the burden *989 of proof, including the burden of proving the aggravating circumstances beyond a reasonable doubt. Jurors are presumed to follow the trial court's instructions. See, e.g., Taylor v. State, 666 So.2d 36, 70 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). We find no error in the prosecutor's statement.

XIII.
We affirm McNabb's convictions and sentences for the attempted murder of Sanford Sharpe and Officer Perkins. Furthermore, in accordance with Rule 45A, Ala.R.App.P., we have examined the record for any plain error with respect to McNabb's conviction on both counts of capital murder, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in the guilt phase of the proceedings.
However, our review of the record reveals that the trial court's capital sentencing order in this case is deficient in that the court failed to comply with the requirement in § 13A-5-47(d), Ala.Code 1975, that it "enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49 [and] each mitigating circumstance enumerated in Section 13A-5-51." (Emphasis added.) Although the trial court thoroughly addressed those statutory aggravating circumstances and statutory mitigating circumstances that it expressly found to exist, it did not make specific findings regarding the existence or nonexistence of the remainder of the statutory aggravating and mitigating circumstances in §§ 13A-5-49 and 13A-5-51. Therefore, we remand this case to the trial court for it to amend its sentencing order with specific findings regarding the existence or nonexistence of each statutory aggravating circumstance in § 13A-5-49 and each statutory mitigating circumstance in § 13A-5-51, and, if necessary, to reweigh the aggravating and mitigating circumstances and resentence McNabb. See, e.g., Wynn v. State, 804 So.2d 1122 (Ala.Crim.App.2000), cert. denied, 804 So.2d 1152 (Ala.2001); McGriff v. State, [Ms. CR-97-0179, September 29, 2000] ___ So.2d ---- (Ala.Crim.App.2000); West v. State, 793 So.2d 870 (Ala.Crim.App.2000); Apicella v. State, 809 So.2d 841 (Ala.Crim.App.2000), aff'd, 809 So.2d 865 (Ala.2001); and Borden v. State, 769 So.2d 935 (Ala.Crim.App.1997), aff'd, 769 So.2d 950 (Ala.), cert. denied, 531 U.S. 961, 121 S.Ct. 389, 148 L.Ed.2d 299 (2000). The trial court shall submit an amended sentencing order in compliance with § 13A-5-47 to this Court within 42 days of the date of this opinion. We pretermit our plain-error review of McNabb's death sentence pending the trial court's return to remand.
AFFIRMED AS TO CONVICTIONS; REMANDED WITH DIRECTIONS AS TO SENTENCING.
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.[5]

On Return to Remand
SHAW, Judge.
On October 26, 2001, we remanded this case to the trial court for it to correct a deficiency in its capital sentencing order. Specifically, we held that the trial court had failed to comply with the requirement in § 13A-5-47(d), Ala.Code 1975, that it "enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49 [and] each mitigating *990 circumstance enumerated in Section 13A-5-51." We remanded the case for the trial court to amend its sentencing order to comply with § 13A-5-47(d) and, if necessary, to reweigh the aggravating circumstances and the mitigating circumstances and to resentence McNabb. The trial court has complied with our instructions. On December 12, 2001, the trial court, on return to remand, submitted an amended sentencing order that satisfies the statutory requirements.
In our opinion remanding the case to the trial court, we addressed all of the issues raised by McNabb regarding the guilt phase of his trial, and we reviewed the record of the guilt phase for plain error. We found no error, plain or otherwise, in the guilt phase of the proceedings and we affirmed McNabb's convictions for two counts of capital murder and two counts of attempted murder. In addition, we addressed in our original opinion all but one of the issues raised by McNabb regarding the sentencing phase of his trial, and we affirmed McNabb's sentences for the two attempted-murder convictions. We pretermitted discussion of one of McNabb's sentencing issues and of our plain-error review of McNabb's death sentence. Now, having the trial court's amended sentencing order before us, we address those issues.

I.
McNabb contends that the trial court improperly "rejected, failed to consider, or failed to accord proper status" to his cocaine intoxication at the time of the offense as a nonstatutory mitigating circumstance. (McNabb's brief at p. 88.)
In Reeves v. State, 807 So.2d 18 (Ala.Crim.App.2000), this Court stated:
"`In Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Supreme Court held that a death penalty statute cannot constitutionally preclude consideration of relevant mitigating factors. However, Lockett does not require that all evidence offered as mitigating evidence be found to be mitigating. Lockett provides that a state may not exclude evidence that the defendant claims is mitigating. This does not mean that all evidence offered by the defendant as mitigating must be found to be mitigating and considered as such in the sentencing process.'
"Ex parte Hart, 612 So.2d 536, 542 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993).' "While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority."' Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), quoting Bankhead v. State, 585 So.2d 97, 108 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev'd, 625 So.2d 1146 (Ala.1993). `Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact.' Harrell v. State, 470 So.2d 1303, 1308 (Ala.Crim.App.1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
"`"A sentencer in a capital case may not refuse to consider or be `precluded from considering' mitigating factors. Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982)(quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978)). The defendant in a capital case generally *991 must be allowed to introduce any relevant mitigating evidence regarding the defendant's character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Ex parte Henderson, 616 So.2d 348 (Ala.1992); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Moreover, the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating. Morrison v. State, 500 So.2d 36 (Ala.Cr.App.1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987)."'
"Wilson v. State, 777 So.2d 856, 892 (Ala.Crim.App.1999), quoting Williams v. State, 710 So.2d 1276, 1347 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). The fact that the trial court does not list and make findings in its sentencing order as to each alleged nonstatutory mitigating circumstance offered by a defendant indicates that the trial court found some of the offered evidence not to be mitigating, not that the trial court did not consider this evidence. See, e.g., Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999)."
807 So.2d at 47-48. See also Waldrop v. State, 859 So.2d 1138 (Ala.Crim.App.2000).
The sentencing order in this case shows that the trial court considered all of the mitigating evidence offered by McNabb. Although the trial court did not find McNabb's cocaine intoxication to be a nonstatutory mitigating circumstance, it did find it to be a statutory mitigating circumstance. In its amended sentencing order, the trial court specifically found that the capital offense was committed while McNabb was "under the influence of extreme mental or emotional disturbance," § 13A-5-51(2), Ala.Code 1975, due to his ingestion of cocaine the morning of the crime and the resulting "cocaine paranoia." In addition, to the extent that McNabb is arguing that the trial court should have found his cocaine intoxication to be a nonstatutory mitigating circumstance as well as a statutory mitigating circumstance, McNabb has cited no cases, and we have found none, that require a trial court to find a particular piece of mitigating evidence to constitute both a statutory mitigating circumstance and a nonstatutory mitigating circumstance.
It is clear from our review of the record that the trial court understood its duty to consider all the evidence McNabb presented in mitigation, that the trial court did in fact consider all such evidence, and that the trial court's findings concerning the mitigating circumstances are supported by the record. Therefore, we find no error on the trial court's part in finding McNabb's cocaine intoxication to be a statutory mitigating circumstance rather than a nonstatutory mitigating circumstance.

*992 II.
As stated above, in our original opinion, in accordance with Rule 45A, Ala.R.App.P., we examined the record for any plain error or defect with respect to the guilt-phase of McNabb's trial; we found no plain error or defect in the guilt-phase proceedings, and we affirmed McNabb's convictions for two counts of capital murder and two counts of attempted murder.
We have now also reviewed McNabb's sentence in accordance with § 13A-5-53, Ala.Code 1975, which requires that, in addition to reviewing the case for any error involving McNabb's capital-murder conviction, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating circumstances and the mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we must determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this Court of the aggravating circumstances and the mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted McNabb of the capital offenses charged in the indictment, a separate sentencing hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala.Code 1975. After hearing evidence concerning the aggravating and mitigating circumstances, after being properly instructed by the trial court as to the applicable law, and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury recommended a sentence of death by a vote of 10-2.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala.Code 1975, to aid it in determining whether it would sentence McNabb to life imprisonment without parole or follow the jury's recommendation and sentence him to death. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). In its amended sentencing order, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975, and any mitigating circumstance found to exist under § 13A-5-52, Ala.Code 1975, as well as written findings of fact summarizing the offense.
In its amended order, the trial court found the existence of three statutory aggravating circumstances: (1) that McNabb knowingly created a great risk of death to many persons, see § 13A-5-49(3), Ala.Code 1975; (2) that the murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, see § 13A-5-49(5), Ala.Code 1975; and (3) that the murder was committed to disrupt or to hinder the lawful exercise of any governmental function or the enforcement of laws, see § 13A-5-49(7), Ala.Code 1975. The trial court found two statutory mitigating circumstances to exist: (1) that the murder *993 was committed while McNabb was under the influence of extreme mental or emotional disturbance, see § 13A-5-51(2), Ala.Code 1975, and (2) that McNabb was 20 years old at the time of the crime, see § 13A-5-51(7), Ala.Code 1975. The trial court also found two nonstatutory mitigating circumstances to exist under § 13A-5-52, Ala.Code 1975:(1) McNabb's family background, and (2) McNabb's lack of a violent criminal history.
The trial court's sentencing order reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, and the advisory verdict of the jury, and after weighing the aggravating circumstances against the statutory and nonstatutory mitigating circumstances in the case, the trial court found that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court sentenced McNabb to death. The trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence, and we find no plain error or defect in the sentencing phase of the proceedings.
McNabb was convicted of one count of murder of a law-enforcement officer who was on duty at the time of his death and one count of murder of a person who was in a vehicle at the time of his death. These offenses are defined by statute as capital offenses. See §§ 13A-5-40(a)(5) and 13A-5-40(a)(17), Ala.Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., Johnson v. State, 823 So.2d 1 (Ala.Crim.App.2001); Sibley v. State, 775 So.2d 235 (Ala.Crim.App.1997), aff'd, 775 So.2d 246 (Ala.2000); Madison v. State, 718 So.2d 90 (Ala.Crim.App.1997), aff'd, 718 So.2d 104 (Ala.), cert. denied, 525 U.S. 1006, 119 S.Ct. 521, 142 L.Ed.2d 432 (1998); Clemons v. State, 720 So.2d 961 (Ala.Crim.App.1996), aff'd, 720 So.2d 985 (Ala.1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999); Block v. State, 744 So.2d 404 (Ala.Crim.App.1997); Carr v. State, 640 So.2d 1064 (Ala.Crim.App.1994); and Harrell v. State, 470 So.2d 1303 (Ala.Crim.App.1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). See also Barksdale v. State, 788 So.2d 898 (Ala.Crim.App.), cert. denied, 788 So.2d 915 (Ala.2000), cert. denied, 532 U.S. 1055, 121 S.Ct. 2200, 149 L.Ed.2d 1030 (2001); and Flowers v. State, 799 So.2d 966 (Ala.Crim.App.1999), cert. denied, 534 U.S. 901, 122 S.Ct. 230, 151 L.Ed.2d 165 (2001).
After carefully reviewing the record of the guilt phase and the sentencing phase of McNabb's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We conclude that the findings and conclusions of the trial court are amply supported by the evidence. We have independently weighed the aggravating circumstances against the statutory and nonstatutory mitigating circumstances, and we concur in the trial court's judgment that the aggravating circumstances outweigh the mitigating circumstances, and that death is the appropriate sentence in this case. Considering McNabb and the crime he committed, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Therefore, McNabb's sentence of death is affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.
*994 On Application for Rehearing
SHAW, Judge.
The appellant, Torrey Twane McNabb, was convicted of two counts of capital murder for the murder of Montgomery Police Officer Anderson Gordon. The murder was made capital because Officer Gordon was on duty at the time of his death, see § 13A-5-40(a)(5), Ala.Code 1975, and because Officer Gordon was in his patrol car at the time of his death, see § 13A-5-40(a)(17), Ala.Code 1975. The jury, by a vote of 10-2, recommended that McNabb be sentenced to death. The trial court accepted the jury's recommendation and sentenced McNabb to death.[1] On October 26, 2001, this Court affirmed McNabb's two capital-murder convictions, but remanded the case for the trial court to correct a deficiency in its capital-sentencing order. See McNabb v. State, [Ms. CR-98-0967, October 26, 2001] ___ So.2d ---- (Ala.Crim.App.2001). The trial court complied with our instructions, and, on February 1, 2002, this Court affirmed McNabb's death sentence. See McNabb v. State, [Ms. CR-98-0967, February 1, 2002] ___ So.2d at ---- (opinion on return to remand).

I.
While this case was pending on rehearing, the United States Supreme Court issued its opinion in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We then gave McNabb and the State an opportunity to file supplemental briefs addressing the impact of Ring on this case. All but one of McNabb's arguments regarding Ring have been decided adversely to him in previous cases. See Ex parte Waldrop, 859 So.2d 1181 (Ala.2002); Duke v. State, [Ms. CR-98-1218, May 31, 2002; March 21, 2003] ___ So.2d ___, ---- (Ala.Crim.App.2002)(opinion on return to remand); Clark v. State, [Ms. CR- 99-1062, December 1, 2000; February 28, 2003] ___ So.2d ___, ---- (Ala.Crim.App.2000)(opinion on return to remand); Stallworth v. State, 868 So.2d 1128, 1178 (Ala.Crim.App.2001)(opinion on return to second remand); Turner v. State, [Ms. CR-99-1568, November 22, 2002] ___ So.2d ---- (Ala.Crim.App.2002); and Tomlin v. State, [Ms. CR-98-2126, November 22, 2002] ___ So.2d ___, ---- (Ala.Crim.App.2002)(opinion on rehearing). We need not address those arguments again here.
However, one argument unique to this case must be addressed. McNabb argues that the two counts of capital murder for which he was convicted  murder of a police officer and murder of a person in a vehicle  have no corresponding aggravating circumstances in § 13A-5-49, Ala.Code 1975, and that it cannot be determined from the record which, if any, aggravating circumstances the jury unanimously found to exist beyond a reasonable doubt. Because the record does not indicate that the jury unanimously found an aggravating circumstance to exist beyond a reasonable doubt, McNabb concludes, his sentence of death was imposed in violation of Ring. In response, the State argues that the jury's guilt-phase verdict finding McNabb guilty of the capital murder of a police officer necessarily included a finding of two aggravating circumstances  that "[t]he capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody," § 13A-5-49(5), and that "[t]he capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of the *995 laws," § 13A-5-49(7). Because the jury unanimously found the existence of two aggravating circumstances by virtue of its guilt-phase verdict, the State says, Ring was not violated.
We agree with McNabb that the jury's guilt-phase verdict finding him guilty of the capital murder of a police officer did not include a finding of any of the aggravating circumstances in § 13A-5-49. In Ex parte Waldrop, supra, the Alabama Supreme Court recognized that "[m]any capital offenses listed in Ala.Code 1975, § 13A-5-40, include conduct that clearly corresponds to certain aggravating circumstances found in § 13A-5-49." 859 So.2d at 1188. In those cases in which the capital offense includes conduct that corresponds to an aggravating circumstance, the jury's guilt-phase verdict necessarily includes a finding of the corresponding aggravating circumstance, see § 13A-5-45(e), and Ring's requirement that the jury determine the existence of the "aggravating circumstance necessary for imposition of the death penalty," has been fulfilled. Ring, 536 U.S. at 609, 122 S.Ct. at 2443.
However, contrary to the State's contention, the capital murder of a police officer under § 13A-5-40(a)(5) does not necessarily include conduct that corresponds with the aggravating circumstances in § 13A-5-49(5) and (7). Section 13A-5-40(a)(5) provides, in pertinent part, that the "[m]urder of any police officer... while such officer ... is on duty, regardless of whether the defendant knew or should have known the victim was an officer ... on duty, or because of some official or job-related act or performance of such officer...." is a capital crime. The murder of a police officer does not have to be "for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody," § 13A-5-49(5), or "to disrupt or hinder the lawful exercise of any governmental function or the enforcement of the laws," § 13A-5-49(7), for the murder to be capital under § 13A-5-40(a)(5). Therefore, a jury's verdict finding a defendant guilty of capital murder under § 13A-5-40(a)(5) does not include a finding of either of the aggravating circumstances in § 13A-5-49(5) or (7). Although in this case, the evidence presented by the State during the guilt phase of the trial was sufficient to establish that the murder in this particular case was, in fact, committed for the purpose of avoiding or preventing a lawful arrest and to disrupt or hinder the lawful exercise of any governmental function or the enforcement of the laws, because the jury was not required during the guilt-phase to even consider those factors we cannot consider its guilt-phase verdict to include a finding as to those factors.
However, merely because the jury's guilt-phase verdict did not include a finding of an aggravating circumstance does not mean that the jury did not unanimously find the existence of an aggravating circumstance. The jury recommended, by a vote of 10-2, that McNabb be sentenced to death. During the sentencing phase of the trial, the jury was instructed on three aggravating circumstances: (1) that McNabb knowingly created a great risk of death to many persons, see § 13A-5-49(3); (2) that the murder was committed for the purpose of avoiding or preventing a lawful arrest, see § 13A-5-49(5); and (3) that the murder was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of the laws, see § 13A-5-49(7). With respect to the finding of any of the three aggravating circumstances, the trial court instructed the jury, in pertinent part, as follows:
"Now, as I stated to you before, the burden of proof is on the State to convince each of you beyond a reasonable *996 doubt as to the existence of any aggravating circumstance considered by you in determining what punishment is to be recommended in this case. This means that before you can even consider recommending that the defendant's punishment should be death, each and every one of you must be convinced beyond a reasonable doubt based on the evidence that at least one or more of the aggravating circumstances exist. In deciding whether the State has proven beyond a reasonable doubt the existence of any given aggravating circumstance, you should bear in mind, and I will repeat again, the definition I gave to you as to reasonable doubt.
"The evidence upon which a reasonable doubt about an aggravating circumstance may be based  is both the evidence you heard in the guilt stage of this trial and the evidence you have heard in this sentencing hearing. The defendant does not have to disprove anything about an aggravating circumstance. The burden is wholly upon the State to prove such a circumstance beyond a reasonable doubt. A reasonable doubt about an aggravating circumstance may arise from all of the evidence, from any part of the evidence, or from a lack or failure of the evidence. You may not consider any aggravating circumstance other than the three aggravating circumstances upon which I have instructed you. And you may not consider an aggravating circumstance unless you are convinced beyond a reasonable doubt of the existence of that aggravating circumstance in this case."
(R. 2599-2601.)(Emphasis added.) These instructions are materially identical to those set out in the Proposed Pattern Jury Instructions for Use in the Sentence Stage of Capital Cases Tried Under Act No. 81-178.
When read as a whole in conjunction with the other instructions given by the trial court at the sentencing phase, these instructions were sufficient to convey to the jury that it must unanimously find the existence of any aggravating circumstance beyond a reasonable doubt before it could consider that circumstance in determining what sentence to recommend. As this Court noted in Moody v. State, [Ms. CR-96-0994, April 18, 2003] ___ So.2d ---- (Ala.Crim.App.2003):
"The fact that the jury's deliberations yielded a vote whether to impose the death penalty  where the jury had been instructed that it could not proceed to a vote unless it first unanimously found the existence of at least one aggravating circumstance  establishes that the jury unanimously found that at least one aggravating circumstance existed. For purposes of Ring, the jury's unanimous finding of at least one aggravating circumstance  regardless of which aggravating circumstance that was  rendered Moody eligible for a sentence of death. In this context, the fact of the jury's vote, rather than the actual vote tally following the jury's weighing process, is the telling circumstance. As the State asserts in its supplemental brief:
"`Whether all twelve jurors find that the aggravating circumstances outweigh the mitigating circumstances or only one juror does, it is the vote itself by the jury on the relative weight of these circumstances that makes the trial court aware whether the jury has unanimously found beyond a reasonable doubt that an aggravating circumstance exists.'
"(State's supplemental brief at pp. 18-19.)"
___ So.2d at ___.
As in Moody, the fact that the jury voted on whether to recommend the death *997 penalty indicates that it unanimously found the existence of at least one aggravating circumstance beyond a reasonable doubt. Because the jury did, in fact, unanimously find the existence of an aggravating circumstance beyond a reasonable doubt, Ring was complied with in this case.

II.
McNabb also presents an additional argument in his supplemental brief that does not involve Ring and that was not presented in his initial brief on appeal or in his application for rehearing: citing Ex parte Bryant, [Ms. 1990901, June 21, 2002] ___ So.2d ___ (Ala.2002), he argues that the trial court's sentencing-phase instructions improperly suggested to the jury that it "could not recommend a sentence of life without the possibility of parole instead of death unless the mitigating circumstances outweighed the aggravating circumstances." (McNabb's supplemental brief at p. 23.) In our opinion on return to remand, we reviewed the sentencing phase of McNabb's trial and found no plain error, that is, no error adversely affecting his substantial rights. However, because that review was conducted before the Alabama Supreme Court's opinion in Ex parte Bryant, out of an abundance of caution, we have again reviewed the sentencing phase, including the trial court's instructions, and we again conclude that no plain error occurred.
The trial court's instructions in this case did not contain the egregious improprieties that the instructions in Ex parte Bryant did, and we conclude that this case is controlled by Ex parte Trawick, 698 So.2d 162 (Ala.1997), which the Supreme Court distinguished in Ex parte Bryant. We have reviewed the record in Ex parte Trawick,[2] and we find that the instructions that were specifically approved by the Supreme Court in that case, and that were reaffirmed by the Supreme Court in Ex parte Bryant, are materially identical to the instructions given in this case. Based on the Supreme Court's opinion in Ex parte Trawick upholding identical instructions, we find no plain error in the instructions in this case; taken as a whole, the instructions in this case did not improperly suggest to the jury "that the death penalty [was] appropriate even if the aggravating circumstances [did] not outweigh the mitigating circumstances so long as the mitigating circumstances [did] not outweigh the aggravating circumstances." Ex parte Bryant, ___ So.2d at ---- (emphasis omitted).
Based on the foregoing, we find no reason to disturb our earlier holding affirming McNabb's capital-murder convictions and his sentence of death. Therefore, McNabb's application for rehearing is overruled.
APPLICATION OVERRULED.
McMILLAN, P.J., and BASCHAB and WISE, JJ., concur. COBB, J., concurs specially, with opinion.
COBB, Judge, concurring specially.
I concur with the majority's denial of McNabb's application for rehearing in this case. I write specially only to comment on the jury instructions regarding the finding of aggravating circumstances  Issue I of the opinion on application for rehearing. I believe that the instructions quoted in the opinion are minimally sufficient. The jury was told that the burden of proof was on the State "to convince each of you beyond a reasonable doubt as to the existence of *998 any aggravating circumstance considered by you...." Although the instructions did not use the term "unanimous," which is a term laymen can readily understand, I believe that the instructions conveyed to the jurors that they were required to unanimously find the existence of any aggravating circumstance beyond a reasonable doubt before they could consider that circumstance in determining the sentencing recommendation. Therefore, the instructions complied with Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
However, a better jury instruction could have been given  an instruction that more clearly articulated the requirement that the jurors unanimously find the existence of an aggravating circumstance before they consider that circumstance in their sentencing determination. A more complete jury instruction was quoted by this Court in Moody v. State, [Ms. CR-96-0994, April 18, 2003] ___ So.2d ___ (Ala.Crim.App.2003). That jury charge included the following instruction:
"`In order to consider an aggravating circumstance, it is necessary that the jury unanimously agree upon its existence. All twelve jurors must be convinced beyond a reasonable doubt and to a moral certainty that an aggravating circumstance exists in order for any of you to consider that aggravating circumstance in determining what the sentence should be.'"
___ So.2d at ___.
The addition of the foregoing instruction to the pattern jury instruction[3] on aggravating circumstance findings would, I believe, more clearly define the unanimity requirement discussed in Ring, and would diminish the concerns regarding juror unanimity.
This special writing is in no way intended to criticize the able trial judge in this case. The judge charged the jury in accordance with the pattern jury instructions for capital cases as recommended by the Alabama Supreme Court. However, in light of Ring, the Alabama Supreme Court could modify the pattern jury instructions with regard to the unanimity requirement to clarify that portion of the instruction for jurors, and ensure that Alabama's jury instructions in capital cases fully comply with Ring.
NOTES
[1] This case was originally assigned to another judge on this Court. It was reassigned to Judge Shaw on January 16, 2001. Although Judge Shaw was not a member of this Court when this case was orally argued, he has reviewed the videotape of the oral argument.
[2] McNabb does not argue that the warrant and its accompanying affidavit were inadmissible on the basis that the statements of the complainant in the affidavit were hearsay. Rather, his argument is directed solely at Officer Gordon's name listed on the face of the warrant as the executing officer. Nevertheless, we find that any error in the admission of the warrant and affidavit based on hearsay statements in the affidavit was clearly harmless. Although the affidavit showed the jury that McNabb had previously been arrested for another crime  specifically, receiving stolen property  there was already ample evidence before the jury, including McNabb's own testimony, that McNabb had previously been arrested for receiving stolen property.
[3] Rule 21.1, Ala.R.Crim.P., was amended effective March 1, 2001, to provide, in part: "[I]n the sentencing phase of the trial of a capital case, the court may, in its discretion, instruct the jury at the beginning of the proceeding."
[4] McNabb also argues that the trial court itself improperly "rejected, failed to consider, or failed to accord proper status" to his cocaine impairment as a nonstatutory mitigating circumstance. (McNabb's brief at p. 88.) However, because we must remand this cause to the trial court for an amended sentencing order, see Part XIII of this opinion, we pretermit discussion of this issue pending the trial court's return to remand.
[5] Although Judge Wise was not a member of this Court when this case was orally argued, the audiotape and videotape of the argument have been made available to her.
[1] McNabb was also convicted of two counts of attempted murder arising out of the same incident and was sentenced to 20 years' imprisonment for each conviction.
[2] This Court may take judicial notice of its own records. See Hull v. State, 607 So.2d 369, 371 (Ala.Crim.App.1992).
[3] Proposed Pattern Jury Instructions for Use in the Sentence Stage of Capital Cases Tried Under Act No. 81-178.